**STATE of Minnesota, Respondent,**

v.

**John David LEMIRE, Appellant.**

**No. 81–169.**

Supreme Court of Minnesota.

Feb. 12, 1982.

Smith, Juster, Feikema, Malmon & Haskvitz and Ronald L. Haskvitz, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Gary Hansen and Richard D. Hodsdon, Sp. Asst. Attys. Gen., St. Paul, John R. Leitner, County Atty., Aitkin, for respondent.

YETKA, Justice.

Appellant, John David Lemire, was convicted of first-degree murder in violation of Minn.Stat. § 609.185(1) (1980) in the brutal stabbing death of 70-year-old Inga Warren. He was tried by a jury in Itasca County District Court following a change of venue from Aitkin County, found guilty, and sentenced to life imprisonment. Essential to the state's case on the element of premeditation was the testimony of Timothy Tibbetts, an admitted accomplice. Appellant contends that there was insufficient evidence to corroborate the accomplice's testimony as required by Minn.Stat. § 634.04 (1980). Appellant asks this court to vacate his conviction or, in the alternative, to modify the conviction to second-degree murder.

We affirm.

On the evening of June 16, 1980, 2 days before the death of Inga Warren, four young men—appellant, Edward Cox, Timothy Tibbetts,[1] and Larry Pratt—burglarized the Rued farmhouse near McGregor, Minnesota, in rural Aitkin County. Among the items taken were a sleeping bag, a C.B. radio, two acetylene tanks, a .22 caliber rifle, a .30–.30 caliber rifle, and two shotguns. With the exception of the acetylene tanks, which were sold that night, these stolen goods were hidden in a ditch along a remote country road.

Two days later, on the morning of the victim's death, Tibbetts and Cox retrieved the items left in the ditch and loaded them into the trunk of Cox's car. Tibbetts, using an assumed name, sold the .30–.30 rifle to a gun dealer in Deerwood, Minnesota. Efforts to sell the remaining weapons were unsuccessful; consequently, the weapons remained in the car's trunk.

Tibbetts and Cox then drove back to Aitkin where they met Lemire around noon. The three decided to have lunch and began to drive to the Mini 47 Club, a local tavern outside of Aitkin. During the ride, Cox said he needed money and suggested they rob a liquor store in Garrison, Minnesota. Lemire and Tibbetts rejected this idea as too dangerous.

Cox next suggested they rob Warren's Bait Shop. The bait shop, which had been run by Inga Warren since 1955, was located 7 miles south of Aitkin on Highway 169. Her shop was open 365 days a year from 7:00 a.m. to 10:00 p.m. Mrs. Warren's living quarters were attached to the shop. Cox suggested that she would have "a lot of money lying around" because she rarely had an opportunity to go to town.

After arriving at the tavern and ordering a pizza and a pitcher of beer, Cox, Tibbetts, and Lemire continued their discussion. Tibbetts testified that Cox suggested that Mrs. Warren be killed because she knew Lemire

---

1. There is an apparent conflict in the proper spelling of this individual's name. Both the transcript and appellant's brief refer to him as Timothy Tibbits while the district court file and respondent's brief refer to him as Timothy Tibbetts. There is no question, however, that only one person is intended.

and Cox and could identify them. Tibbetts also testified that Cox initially asked him to kill her; Tibbetts refused. Cox also asked Lemire, who replied he would think about it.

The waitress at the Mini 47 Club, Mabel Yaggy, recalled giving the trio a pen (embossed with the tavern's name) and a blank guest-check. This paper was used to draw maps of the area around Warren's Bait Shop.

The three left the Mini 47 Club and drove to Crosby where they purchased two 12-packs of beer. They continued to drive around for an hour and a half, consuming 15 to 18 cans of beer. The discussion returned to Warren's Bait Shop. Tibbetts testified that Cox again asked him if he would kill Mrs. Warren, and again he refused. Lemire was also asked several times by Cox, but Lemire responded only that he would think about it. After continued questioning by Cox, Lemire finally agreed to kill Mrs. Warren, according to Tibbitts.

Lemire suggested that a knife would be needed to kill her since the firearms in the trunk of Cox's car would be too noisy. Lemire also recommended using gloves to cover up any fingerprints.

At approximately 6:00 p. m. that evening, the trio of Cox, Tibbetts, and Lemire drove to the Holiday gas station in Crosby where they purchased (after comparing models) an inexpensive sheathed hunting knife ($9.99) as well as three pairs of brown cotton gloves (99¢ a pair). They received a dated receipt for their purchases.

Following the purchase of the gloves and knife, the three men continued to drive around and consume more of the previously purchased beer. In addition, Tibbetts purchased several black pills which he called "speed."[2] The men also drove past the bait shop to determine if it was open.

Between 7:00 and 8:00 p. m., Cox parked the car in a hidden location near an abandoned business which was a short distance from the bait shop. The threesome remained there for a short time as Lemire explained that he would go into the bait shop, ask for a pack of cigarettes, and then stab Mrs. Warren when she turned around to get them.

As the men got out of the car and started across the road, Lemire told Cox to take off his white T-shirt because the color was too easily seen. Cox did as Lemire requested and threw his shirt in a nearby ditch. Lemire was carrying the knife in the right front pocket of his black corduroy pants. He had cut the top of the sheath off so that the knife could slide easily in and out of his pocket. The trio worked their way through the long grass, brush and fields for nearly one-half hour before reaching a position approximately 30 yards south of the shop. There they rested for a few minutes.

Lemire then proceeded halfway to the bait shop, but returned, saying he didn't know if he could do it. Upon the further urging of Cox and Tibbetts, Lemire went back to the bait shop and entered. Cox and Tibbetts remained in hiding in the tall grass for 5 to 10 minutes. When Lemire failed to appear, the two approached the front of the shop; just then Lemire opened the front door and told them to come in.

Lemire switched the shop's "open" sign to "closed" and locked the front door. Cox and Tibbetts had their gloves on; Lemire was now also wearing gloves but had not had them on when he first entered the bait shop. Lemire told the others that he had stabbed Mrs. Warren and had put her body in a storeroom. Blood was visible in a footprint on the floor and on Lemire's hands.

The trio began rummaging through the shop and living quarters. They discovered several thousand dollars in cash, some jewelry, and a silver belt buckle, all of which were placed in a plastic bag found on the premises. The men left the shop 15 to 20 minutes after they had entered.

---

2. Laboratory analysis revealed that these pills were simply an over-the-counter medication containing ephredrine (a cold tablet preparation) and caffeine.

The threesome fled across the highway and into a clump of evergreens and then into a swamp. As they ran, Lemire threw the knife and its sheath into the swamp. The men also discarded their gloves in the swamp. They continued until they reached the car. The men then began to drive back towards the Crosby area. Enroute, they stopped at a bridge and threw the guns stolen in the Rued burglary into a lake. They later pulled off the road and into a field, sorted out the cash and threw the bag with its remaining contents away.

The trio stopped for the night at the Lakeview Motel in Crosby; Lemire and Cox went in to register for a room. Once inside the room, the men split the money which was strapped in $500 bank wrappers. Cox got approximately $1,400; Lemire and Tibbetts, $1,200 each. Lemire and Tibbetts each put their shares in the bedside nightstand.

The next morning, the three men went for a ride in Cox's car. Along the Cuyuna Road, they stopped, took off their shoes and socks, and threw them into the ditch. They also disposed of the two empty "12-pack" cartons as well as the sleeping bag and the C.B. radio stolen from the Rued farm. The threesome proceeded towards Aitkin. At around 9:30 a.m., Cox dropped off Lemire and Tibbetts at the Emil Swanson residence.[3]

Both Tibbetts and Lemire changed into dry clothes at Swanson's before going into downtown Aitkin, where both men made purchases. Tibbetts bought a used car for $1,100 from Scott Harms; Lemire, a brown leather hat. The two then drove to Crosby where Lemire purchased two sleeping bags, seat cushions, and a road atlas from the same assistant manager of the Holiday station who had waited on them the night before. That evening, they went to a party in Crosby, after which they checked into the Lakeview Motel for a second night.

Tibbetts and Lemire were apprehended at the motel the following morning. A search of the room resulted in the discovery of a brown leather hat, a sock full of bills in the top drawer of the nightstand, and a roll of dimes marked with a "W." The sock contained $994, including five blood-stained $1 bills.

Following his arrest, Tibbetts gave a series of statements to the police. Tibbetts maintained at first that only he and appellant were involved in the murder and that they had intended only to rob Mrs. Warren. Tibbetts directed the police officers to the area where the knife, sheath, and gloves were subsequently recovered. However, Tibbetts misled the officers as to the correct location of other physical evidence. In subsequent statements, he told the police of the correct location of the clothes worn the night of the murder, the shoes, socks, and other property discarded along Cuyuna Road, and the plastic bag taken from the bait shop. Among the items recovered by police from the Cuyuna Road location were: three tags marked "quality work gloves," $500 bank wrappers, a receipt dated June 18, 1980, from the Crosby Holiday store for one $9.99 item and for three 99¢ non-taxable items, and torn pieces of a guest-check which, when pieced together, formed a map.

At trial, Dr. Richard Rottschafer, pathologist and deputy coroner for Crow Wing County, testified that Inga Warren had been stabbed 19 times, including several defense wounds on her fingers and hands. Dr. Rottschafer also concluded that because of the general nature of the wounds and their depth, the recovered knife could have been the murder weapon. Among the stab wounds was a major gash on the victim's back.

The testimony of Wally Sorem, an analyst of the BCA's laboratory, established that a pair of Lemire's black corduroy jeans found at Emil Swanson's house had blood stains in the top area of the right front pocket. Analysis of the stain determined that it was type O blood—the same type as

---

**3.** T. Tibbetts had been living at the home of Emil Swanson for approximately 2 to 3 months after leaving his parents' home.

Mrs. Warren's.[4] There were also four separate cuts inside the front pocket. Only one of the dollar bills had sufficient blood to allow a type analysis to be made. This blood also was determined to be type O. Blood on a glove found in the swamp matched in six separate tests with the deceased's while the blood on the knife matched in seven tests. Also found on the knife was a black cotton thread which matched the cotton thread of the appellant's black corduroys.

Introduced into evidence at trial was a portion of a letter written by appellant in which he called himself a murderer, stated Cox got him into the mess, and predicted that Tibbetts would get 2 to 5 years and he would get 5 to 10 years.

Appellant presented no evidence and did not testify at trial.

The issue presented on appeal is whether there was sufficient evidence to corroborate the testimony of accomplice Tibbetts on the issue of premeditation.

Murder in the first degree is committed under Minn.Stat. § 609.185(1) when a person "[c]auses the death of a human being with premeditation and with intent to effect the death of such person * * *." " 'Premeditation' means to consider, plan or prepare for, or determine to commit the act referred to prior to its commission." Minn. Stat. § 609.18 (1980). Defendant argues that the only evidence of premeditation was the testimony of the accomplice Tibbetts and that this testimony was not corroborated as required by Minn.Stat. § 634.04 (1980).[5]

■ Premeditation indicates a pre-existing reflection and deliberation involving more than a mere intent to kill. *State v. Lee*, 282 N.W.2d 896, 901 (Minn.1979); *State v. Keaton*, 258 Minn. 359, 363, 104 N.W.2d 650, 654 (1960). However, extensive planning and calculated deliberation do

not have to be shown before premeditation can be established. *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979); *State v. Neumann*, 262 N.W.2d 426, 430 (Minn.1978). "Premeditation is a state of mind; it can generally only be inferred from circumstantial evidence." *State v. Linder*, 304 N.W.2d 902, 906 (Minn.1981). In this case, the principal evidence of premeditation came from the testimony of accomplice Tibbetts.

■ It is not necessary that Tibbetts' testimony be corroborated on every point or element of the crime. *State v. McLaughlin*, 250 Minn. 309, 319, 84 N.W.2d 664, 672 (1957); *State v. Lyons*, 144 Minn. 348, 355, 175 N.W. 689, 692 (1919). Corroboration does not require the establishment of a prima facie case. *State v. Houle*, 257 N.W.2d 320, 324 (1977); *State v. Sorg*, 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966). Corroborative evidence "is sufficient if it restores confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial degree." *State v. Houle*, 257 N.W.2d 320, 324 (1977). *See also Matter of Welfare of K.A.Z.*, 266 N.W.2d 167 (1978); *State v. Armstrong*, 257 Minn. 295, 101 N.W.2d 398 (1960). More specifically, this court has held:

> Since premeditation is rarely susceptible to direct proof and must be inferred from all the circumstances surrounding a homicide, * * * corroborating evidence of premeditation must be independent evidence (i.e., not from the accomplice) of facts which tend in some reasonable degree to confirm the jury's inference of premeditation.

*State v. Martin*, 261 N.W.2d 341, 345 (Minn. 1977).

■ The state presented abundant independent evidence to confirm the jury's inference of premeditation.

4. Mrs. Warren, Tibbetts, and Cox all had type O blood while appellant's blood type was A.

5. Minn.Stat. § 634.04 (1980) provides: "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such

other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

a. David J. Shire, assistant manager of the Holiday gas station in Crosby, testified that in the late afternoon hours of June 18, 1980 (the day of the murder), he sold a leather sheathed hunting knife and three pairs of cotton gloves to three young men, including the appellant. Mr. Shire also identified a cash register receipt discovered among the discarded items found along the Cuyuna Road as the receipt for that sale.

b. Mr. Shire testified that the three men inspected the hunting knife and discussed its purchase before selecting the cheaper model. He also testified that one of the three asked if the knife was suitable, if it was what they wanted, and that they all agreed it was.

c. The stipulated facts of the Rued farm burglary indicate that on June 18, 1980, Cox and Tibbetts had two shotguns and a rifle available in the trunk of Cox's car. It would be possible for the jury to infer from the purchase of the hunting knife that the trio had more than a robbery planned since they already had sufficient weaponry available.

d. Mabel Yaggy, a waitress at the Mini 47 Club tavern, testified that three men, including appellant and Tibbetts, came into the establishment around noon for pizza and beer. The trio asked for a pad and pencil and were given a pen and a clean page from her guest-check book. Found among the discarded items belonging to the trio along Cuyuna Road were 14 pieces of paper which, when pieced together, formed a single cafe guest-check with a map of the area of the bait shop drawn on it in ink.

e. Dr. Rottschafer indicated that Mrs. Warren had been stabbed with a knife or similar instrument 19 times, including wounds to her back, upper abdomen, and chest, as well as to her hands and fingers. He also testified that none of the wounds was deeper than the length of the knife's blade. We have recognized that, although the severity and duration of a beating *alone* will not support a finding of premeditation, *State v. Swain*, 269 N.W.2d 707, 713–14 (Minn.1978), such a finding can be justified by all of the circumstances, with due defer-

ence given to the jury's verdict. *State v. Wahlberg*, 296 N.W.2d 408, 416 (Minn.1980); *State v. McCullum*, 289 N.W.2d 89, 91–92 (Minn.1979).

In *Wahlberg*, where there was evidence beyond the beating itself to support an inference of premeditation, including the fact that an axe which defendant had carried in his car was missing after the murder, a conviction for first-degree murder was affirmed. Likewise, in *McCullum*, the brutality of the beating, the decedent's break-up with the defendant, along with the other facts in the case, were sufficient to confirm the first-degree murder conviction. In *State v. Linder*, 304 N.W.2d 902 (Minn. 1981), we refused to reduce defendant's conviction from first- to second-degree murder and noted that the jury may have relied on any of the following evidence in reaching its verdict:

> (1) the victim had suffered multiple blows at the hands of defendant; (2) the victim's blood was found in several rooms of her home; (3) the lead pipe used to inflict the blows was probably not already in the home but was brought in from outside; (4) the victim could be observed from the shed behind her home, and there was evidence that defendant had been in the shed; and (5) the home was the only one of six homes in the immediate area with but one occupant.

*Id.* at 906.

f. Dr. Rottschafer testified that Mrs. Warren had received a major, non-lethal wound on her back. This was consistent with the plan of attacking Mrs. Warren when she turned her back to get the requested cigarettes.

g. The sheath found by Pat Scott of the Aitkin County Sheriff's Department had a portion of the scabbard cut off. The sheath also had human blood on it. This would support Tibbetts' account of the murder plan.

h. In his letter, appellant confessed to being a murderer and to the expectation of a more severe punishment than Tibbetts. An accused's confession can be adequate

corroboration of an accomplice's testimony. *State v. Azzone*, 271 Minn. 166, 135 N.W.2d 488 (1965).

In addition to this evidence, which is corroborative of Tibbetts' testimony regarding premeditation, there was other significant testimony which, in substantial degree, tended to affirm the truth of Tibbetts' testimony. For example, Tibbetts described where much of the physical evidence could be found. The knife, sheath, gloves, shoes, farm burglary loot, bait shop jewelry, and clothes were all found where Tibbetts said they would be. Tibbetts' description of the path to and from the bait shop and the location where the car was parked was totally consistent with the observations made by the officers.

Appellant correctly points to numerous inconsistencies in the prior statements made by Tibbetts as an indication of a lack of credibility in Tibbetts' testimony. However, in *State v. Oevering*, 268 N.W.2d 68 (Minn.1978), this court stated:

> When reviewing a jury verdict, we must examine the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testimony which conflicts with the result it reached. If on the basis of the evidence in the record the jury could reasonably have found as it did, we may not upset that conclusion.

*Id.* at 71 (citations omitted). The jury's verdict should be given deference. *State v. McCullum*, 289 N.W.2d at 91. Therefore, although Tibbetts admitted lying to the police on various occasions, the jury did believe his testimony.[6] There is nothing in the record to suggest that this was an unreasonable belief.

The conviction is affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

---

6. The jury was given a jury instruction, CRIM-JIG 3.15, regarding accomplice testimony.