STATE of Minnesota, Respondent,

v.

Edward T. COX, Appellant.

No. 81–413.

Supreme Court of Minnesota.

July 30, 1982.

Robert Latz and David J. Goldman, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Gary Hansen and Richard D. Hodsdon, Sp. Asst. Attys. Gen., St. Paul, John R. Leitner, County Atty., Aitkin, for respondent.

PETERSON, Justice.

Inga Warren, the 70-year-old proprietress of Warren's Bait and Tackle near Aitkin, Minnesota, was murdered by John D. Lemire on June 18, 1980, during a robbery of the bait store and adjoining living quarters. Defendant Edward T. Cox was arrested 2 days later near Becker, Minnesota, and charged with second-degree murder for his participation in the planning and execution of the crime. On July 2, 1980, the Aitkin County Grand Jury indicted defendant for murder in the first degree. He was tried by a jury in Pennington County, following a change of venue, and convicted of second-degree murder. Minn.Stat. §§ 609.05, subds. 1 and 2, 609.19 (1980). The district court subsequently sentenced him to 121 months' imprisonment.

Defendant appeals from the conviction, maintaining that (1) he was denied due process and a fair trial because of a prejudicial statement made by an officer of the court in the presence of the jury, (2) the admission of other-crimes evidence constitutes reversible error, and (3) there was insufficient evidence to corroborate an accomplice's testimony as required by Minn. Stat. § 634.04 (1980). We affirm.

The circumstances surrounding the murder of Mrs. Warren are set forth in *State v. Lemire*, 315 N.W.2d 606 (Minn.1982). The principal witness for the prosecution in both the Lemire and the Cox trials was a third participant, Timothy Tibbetts. Since his testimony in this case is virtually identical to the testimony reported in *Lemire*, we need only outline those facts for purposes of this appeal.

Defendant Cox and three other young men burglarized a farmhouse on June 16, 1980, taking among other things four guns and two acetylene tanks. At that time, defendant was in need of money to make car payments and pay various bank loans; two of the others—John Lemire and Timothy Tibbetts—needed money for a trip to California.

The acetylene tanks were sold immediately and the other items were hidden in a ditch. On June 18, 1980, the day of the murder, defendant and Tibbetts retrieved the guns and other items. After attempting with limited success to sell the guns in Deerwood and Crosby, the pair returned to Aitkin and met Lemire around noon. The trio had lunch together in a local tavern outside of Aitkin.

The decision to rob Warren's bait store evolved from defendant's suggestion that they hold up a liquor store in Garrison. The liquor store robbery was rejected as too dangerous, but the Warren bait store, familiar to defendant and Lemire, was seen as an easier target. Two maps were drawn and a sketchy plan was made to park a car in a secluded spot and approach the bait store on foot. Tibbetts testified that Cox repeatedly asked Tibbetts and Lemire if they "wanted to kill Mrs. Warren." Eventually Lemire responded that he would kill Mrs. Warren. The men spent the afternoon in Crosby, drinking beer and driving around. They bought a hunting knife and three pairs of work gloves at the Holiday station in Crosby.

At about 6 or 7 p. m., they drove from Crosby to the stretch along Highway No. 169 where Warren's bait store is located. They drove by it, Cox at the wheel, and parked off of the highway near an abandoned business. Tibbetts testified that as they sat near the parked car Lemire described how he would ask Mrs. Warren for something behind the counter and stab her

when she turned around. The threesome then walked and crawled the 1½-mile distance to the store, keeping themselves 50 to 100 yards from the highway to avoid detection.

While Tibbetts and Cox waited outside, Lemire headed toward the bait store, hesitated midway, and then returned. After urging from Cox and Tibbetts, Lemire entered the store, stabbed Mrs. Warren 19 times and began to search for money and valuables. When Lemire had been in the bait store 10 minutes, Cox and Tibbetts approached the door. Lemire waved them in and the threesome completed the robbery. They returned to the car, drove to Crosby and spent the night in a motel.

On June 19, 1980, the young men disposed of their shoes and socks, the empty beer cartons and several items stolen on June 16. Cox dropped off the other two in Aitkin at 9:30 a. m. and drove to Becker, Minnesota, where he spent the day doing odd jobs with his brother. Tibbetts and Lemire remained in the Aitkin-Crosby area, making several purchases and preparing for the trip to California. They stayed at the same motel in Crosby and were arrested there on the morning of June 20. Cox was picked up in Becker on June 20 and placed under arrest.

The testimony of Cox departs from the Tibbetts' testimony heard in *State v. Lemire* and again at Cox's trial. The gist of his defense is that he did not believe Mrs. Warren would be in the store and that, if she was, Lemire would not proceed with the plan.

In particular, Cox testified that Lemire suggested robbing Warren's bait store because Mrs. Warren was "not supposed to be home"—that she would be grocery shopping with her sister. According to Cox, Lemire said he wanted to buy a knife to aid in breaking into the bait store and to use defensively if someone came in during the burglary. Cox testified that he then told Lemire he would not get involved in murder—that he would only go through with the burglary if Mrs. Warren was away.

Cox admits that he purchased the knife at the Holiday station, but said he did so only because Tibbetts handed him ten dollars and asked him to make the purchase as Cox went for a can of pop.

When the trio headed toward Warren's bait store, according to Cox, the understanding was that Mrs. Warren would not be hurt; they would break into the store only if she was not there. Although Cox drove the threesome past the bait store en route to the place they left the car, he claims not to have seen the "open" sign in the front window. He noticed lights were on, but says he assumed they were automatic lights that come on at night. Lemire allegedly told Cox as they passed that Mrs. Warren was not there.

Once the car was parked, the discussion again turned to whether Mrs. Warren was at the store, and Lemire restated that she was not. Cox claims that he gave Lemire a dollar so that, if she was there, he could make a purchase "so it didn't look like we were just snooping around the building."

Cox also gives a different account of what occurred after the trio arrived at the store. From where they were sitting Cox says he still could not see whether the store was open. Lemire went 20 or 30 feet toward the front of the store and came back saying "I don't know if I can do it." Rather than urging Lemire to continue, Cox testified that he said, "If you ain't going to do it, let's go." Lemire then responded, "Well, I'll go up there and see what's going on."

Cox admits to participating in the robbery but denies that he accepted his third of the money; Tibbetts had testified that Cox took his third plus $200 from Lemire in satisfaction of a debt. No money or other items from the store were found on Cox or in his car when he was arrested.

1. During the trial a sheriff acting as an officer of the court made a statement, heard by at least seven jurors, that defendant argues was so prejudicial that it violated his sixth and fourteenth amendment rights. Juror Wahlbeck reported the incident to the trial court, and a hearing was held to determine what was heard and

whether it would deprive defendant of a fair trial. The consensus of those jurors who heard the remark was that the sheriff said, "As far as I am concerned it is all over [when the prosecution rests], but I am prejudiced." One juror, however, recalled that the sheriff also expressly stated that Cox was guilty. Whether the sheriff actually said Cox was guilty may be irrelevant, because at that point in the trial the defendant had neither made an opening statement nor presented evidence. Thus, by declaring that "it is all over," the sheriff left no doubt that he believed the prosecution had proven its case.

The trial court examined each juror out of the presence of the others, pursuant to Minn.R.Crim.P. 26.03, subd. 9, and inquired whether they had drawn any inferences from the remark and whether it would affect their ability to be fair and impartial. The judge also reminded the jurors that the sheriff was not a witness in the case and that it would be improper for the jury to consider this remark.

At the close of the voir dire, defense counsel moved for a mistrial and the motion was denied. After the defense rested, the trial court again addressed this issue in chambers and offered to substitute either or both alternate jurors for regular jurors who had heard the remark. Defendant's counsel at that time declined the offer. Nonetheless, prior to the jury deliberation, the court excused Juror Wahlbeck. The jury that convicted defendant therefore included six jurors who had admitted hearing the prejudicial remark.

The issue on appeal is whether the trial court clearly abused its discretion in determining from the voir dire that defendant could still obtain a fair trial by an impartial jury, despite the sheriff's remark. *State v. Warren*, 201 Minn. 369, 374, 276 N.W. 655, 658 (1937). *See also People v. Schram*, 1 Mich.App. 279, 284–85, 136 N.W.2d 44, 46–47 (1965); *People v. D'Argento*, 106 Ill. App.2d 36, 40–41, 245 N.E.2d 501, 504 (1969).

The leading case involving improper communications between a court official and the jury is *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam). In that case, post-conviction relief was granted on the ground that statements by a bailiff, regarding the defendant's guilt and the availability of appellate review if a guilty verdict is incorrect, violated the sixth and fourteenth amendments. The exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source of the material. *Id.*, 385 U.S. at 364, 87 S.Ct. at 470. Subsequent decisions have analyzed the impact of outside influences on criminal trials in a similar fashion regardless whether the source is "pervasive adverse prejudicial publicity," the "ill-chosen remarks of a bailiff," or information introduced into the jury room by a participating juror. *Bulger v. McClay*, 575 F.2d 407, 411 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978); *United States v. Howard*, 506 F.2d 865, 867 (5th Cir. 1975). In the present case, the sheriff's comment contained inadmissible opinion evidence of Cox's guilt and was an invasion of the jury's function of evaluating the evidence. Unless the "piercing effect" of this extrinsic material "is only skin deep and without prejudice to the anatomy of the trial, we must apply a constitutional salve." *United States v. Howard*, 506 F.2d at 866.

■ Statements of a court official about the merits of a criminal case raise a rebuttable presumption of prejudice. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). The presumption of prejudice is warranted because "the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury." *Parker*, 385 U.S. at 365, 87 S.Ct. at 470. The burden on the prosecution to rebut the presumption is met only by showing beyond a reasonable doubt that the asserted error did not contribute to the verdict obtained. *State v. Crisler*, 285 N.W.2d 679 (Minn.1979); *see also United States v. Bruscino*, 662 F.2d 450, 457–58 (7th Cir. 1981);

*Gibson v. Clanon*, 633 F.2d 851, 853–54 (9th Cir. 1980) (test also phrased as no reasonable possibility that the extrinsic material could have affected the verdict), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).

■ We do not, however, permit inquiry into the validity and reliability of a verdict to infringe on the jury's freedom at deliberation. Minn.R.Evid. 606(b) protects the juror's thought processes and mental operations from later scrutiny. Therefore, the proper procedure for reviewing a jury verdict is to determine from juror testimony what outside influences were improperly brought to bear upon the jury and then estimate their probable effect on a hypothetical average jury. *United States ex rel. Owen v. McMann*, 435 F.2d 813, 820 (2d Cir. 1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971); *Commonwealth v. Fidler*, 377 Mass. 192, 385 N.E.2d 513, 519 (1979).[1]

■ The relevant factors to be considered by this court, in an independent evaluation of the verdict, are the nature and source of the prejudicial matter, the number of jurors exposed to the influence, the weight of evidence properly before the jury, and the likelihood that curative measures were effective in reducing the prejudice.

■ Within these four areas of inquiry, a number of facts support defendant's request for a new trial. The sheriff's remark intimated an opinion on the ultimate question of guilt or innocence; it was heard by seven jurors,[2] including six of those voting on the verdict; and his position as sheriff might have induced the jury to consider him more competent to recognize a guilty defendant than the jurors themselves.

■ Even though the prejudicial matter in this case reached twice as many jurors as were exposed in *Parker*, several considerations persuade us that the likelihood of a tainted verdict is much less here. First, the remark was more clearly expressed as an opinion affected by the bailiff's own prejudices. Second, there is overwhelming evidence that Cox participated in the bait store robbery and substantial testimony of an accomplice establishing the element of intent or foreseeability. The facts in the present case more closely resemble those in *United States v. Brumbaugh*, 471 F.2d 1128 (6th Cir.) (per curiam), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144, *reh'g. denied*, 414 U.S. 1033, 94 S.Ct. 465, 38 L.Ed.2d 326 (1973), holding a conversation between a juror and bailiff was harmless error, where the defendant admitted participating in the robbery but claimed he was an unwilling participant.

A more significant departure from the circumstances in *Parker* is that the trial court learned of the bailiff's misconduct during the trial and thus had an opportunity to ameliorate the prejudicial impact before a verdict was rendered. A trial judge's prompt individual voir dire and careful instructions may be sufficient, in light of all the circumstances, to support a finding of no prejudice. *Sher v. Stoughton*, 666 F.2d 791, 794–95 (2d Cir. 1981). In this case, the voir dire reinforced the jurors' understanding that the sheriff's remark was improper and that defendant was entitled to have his case decided by an open-minded, impartial jury. The jury was reminded to decide the case solely on the testimony of sworn witnesses.

We hold there is no reasonable possibility that the sheriff's remark would affect the

---

1. Rule 606(b) does not prohibit the trial court, during a special voir dire conducted prior to deliberations, from questioning the jurors about the likely effect of a prejudicial statement on the subsequent deliberations. While the inquiries cannot elicit admissible responses, they may be effective as a corrective measure to reduce prejudicial impact. In effect, the questions evoke a renewed pledge from each juror that the evidence will be weighed impartially.

2. The sheriff's presence during the voir dire might have led other jurors to deny hearing the remark to avoid embarrassment to him. Our decision in this case does not turn on whether 7, 9, or 11 jurors heard the remark, but the better course in future cases would be to exclude the errant bailiff from the special voir dire.

verdict of an average jury given the nature of the remark, the weight of evidence supporting conviction and the probable curative effect of the trial court's voir dire and instructions. Therefore, the trial court did not abuse its discretion in denying the motion for mistrial.

2. Defendant next challenges the admission of evidence related to the burglary of the Rued farmhouse on June 16, 1980. The state served a *Spreigl* notice and sought admission of the evidence under the exceptions for proof of intent, motive, identity, lack of mistake or accident, and common scheme or plan. The trial court admitted the evidence on the grounds that the facts of the Rued burglary are so interwoven with the facts of this case as to be inseparable and that the evidence helps to establish motive and identity. A limiting instruction was given when the Rued burglary was first mentioned in the state's case-in-chief. A limiting instruction was also given at the close of trial.

Defendant carries the burden of showing that the asserted error "substantially influence[d] the jury to convict." *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981). Even assuming the admission of the burglary evidence was error, defendant is unable to meet this burden.

 The June 16 burglary was a nonviolent property crime at a farmhouse known to be unoccupied. Despite obvious factual distinctions between the manners in which the Rued burglary and Warren robbery were committed, admission of evidence about the earlier crime may in fact strengthen defendant's position that he went to the bait store with the sole intent to commit burglary. If viewed by the jury as evidence of a general propensity to violate the law—clearly an improper inference and inadequate ground for admissibility—the degree of prejudice still does not rise to meet the *Loebach* test, given the devastating impact of Tibbetts' testimony on defendant's case. We hold that the admission of other-crimes evidence, if error, was not prejudicial.

 3. Defendant asserts that the evidence establishing the requisite element of intent for conviction of second-degree murder is found solely in the uncorroborated testimony of an accomplice, Timothy Tibbetts. Minn.Stat. § 634.04 (1980) requires corroboration that tends to affirm the truth of the accomplice's story and tends to some degree to establish appellant's guilt. After examining the record, we hold, as we did in *State v. Lemire*, 315 N.W.2d at 610–612, that the state presented sufficient corroborating evidence of intent to support the conviction.

Affirmed.