STATE of Minnesota, Respondent,

v.

Wornice LLOYD, Appellant.

No. C5–82–1231.

Supreme Court of Minnesota.

Feb. 24, 1984.

C. Paul Jones, Minn. Public Defender, Kathy King, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Richard Osborne, J. Michael Richardson, Asst. County Attys., Beverly J. Wolfe, Minneapolis, for respondent.

SCOTT, Justice.

On March 16, 1982, the Hennepin County Grand Jury indicted defendant Wornice Lloyd on two counts of first-degree murder in violation of Minn.Stat. §§ 609.185(1) and 609.185(3) (1982), in connection with the death of Derrio Green.[1] Following a jury trial, he was convicted of first-degree murder under section 609.185(1). Defendant appeals from the judgment of conviction, contending that the trial court erred (1) by denying his motion to prohibit the state from using a prior murder conviction to impeach him if he testified, and (2) by deny-

---

**1.** Minn.Stat. § 609.185 provides in relevant part:

Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

(1) Causes the death of a human being with premeditation and with intent to effect the death of the person or of another;

\*　\*　\*　\*　\*　\*

(3) Causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit \* \* \* aggravated robbery \* \* \*.

ing his motion for a continuance. He also challenges the sufficiency of the evidence to support the murder conviction. We affirm.

Derrio Green was shot several times and killed on the evening of February 11, 1982. Before meeting that fate, he had spent the day celebrating his recent good fortune. Earlier that week, he had received approximately $3,300 as the beneficiary of an insurance settlement trust fund. On the morning of February 11, he arranged to have Charles Rice, his sister's fiancé, accompany him to purchase a car with some of that money. They met at Green's sister's house in north Minneapolis sometime after 1:00 p.m. that day. While there, Green showed Rice that he had 27 one hundred dollar bills. The two men then went to Blitz Auto Sales and purchased a 1972 Ford Thunderbird for approximately $1,000.

After purchasing the car, they bought some beer at a liquor store, then drove around for about one-half hour, and finally stopped at the Elk's Club, located across the street from Green's sister's house. There, they met "Pork" Jamieson, a friend of Green's. Each of them had a drink and then all three returned to the liquor store, where they purchased a half-pint of brandy.

Upon continuing their aimless journey, they spotted Annie Hudson and pulled over to speak with her. Before that time she had never spoken to Green, though she knew him by sight, and she did not know Rice. She accepted a ride to downtown Minneapolis from them. During the trip downtown, Green threw his money in her lap and asked her to count it. She counted $1,700 in one hundred dollar bills.

After dropping Hudson off downtown, the three men drove to Green's sister's house, parked there, and then walked over to the Elk's Club for another drink. While inside, Green got into arguments with the proprietor and Jamieson. At some point, Green laid his money on the bar and said he wanted to buy drinks for everyone. There were approximately 20 to 25 people in the bar. Rice stopped the bartender from preparing the drinks. Rice testified that defendant Wornice Lloyd was in the Elk's Club when Green was "flashing that money," but he did not know exactly where Lloyd was in the bar at that time. Green was eventually asked to leave the Elk's Club because of his rowdy behavior.

After eating at a nearby McDonald's, Rice and Green dropped Jamieson off in downtown Minneapolis about 7:20 p.m. Green and Rice then went to Rice's mother's home so Rice could pick up some clothes, and then Green dropped Rice off at his sister's house. After Rice got out of the car, Annie Hudson got into it. Green then drove her a short distance to her mother's house, located on the corner of Knox and 12th Avenue North. He parked the car on 12th Avenue near her mother's house, and they spoke for a few minutes. While they were talking, defendant Lloyd came up to the driver's window, exchanged words with Green, and then got into the rear seat behind Green. A few minutes later Hudson left the car, which remained parked for three to five minutes and then proceeded west along 12th Avenue.

Shortly thereafter, Mary Gartrell was driving east along 12th Avenue toward Knox Avenue about 8:25 p.m. In front of her, she saw a blue and white Thunderbird (Green's car) parked on 12th Avenue facing east, with the driver's door open. As she approached that car, she heard a "pop" and saw a person get out of the car on the driver's side. That person, later identified as Green, was hunched over and clutching his abdomen. She swerved to avoid hitting Green, stopped at the corner and, after pulling around the corner, turned around to see him lying in the street. She also saw a second person get out of the car on the passenger side, but she did not remember whether that person got out before or after Green. Gartrell thought she saw that person run down Logan Avenue, but she was not sure. A few days later, she failed to identify defendant as the second person when shown a photo lineup.

Cynthia Mansaray also witnessed the events occurring on 12th Avenue at approximately 8:30 p.m. that evening. At that time she was in her bedroom, which faced 12th Avenue. Upon hearing arguing outside, Mansaray looked out her bedroom window and saw two men standing near a blue and white Thunderbird. She saw a man, later identified as Green, push a second man, then the second man returned the push and fired two shots at Green. Immediately after the second shot, Green fell to the ground. The second man ran toward the alley, stopped and then returned to the body. After returning to the body, the second man turned and looked toward her home for a "minute or minute and a half." He then turned and ran down the alley while she phoned the police. Four days later, Mansaray identified defendant as the second man when shown a photo lineup. At trial, she testified that she had no doubt that Lloyd was the man who shot Green.

When the police arrived, Mansaray went outside and joined the crowd which was gathering. She testified that she saw "the suspect come back in the crowd." She purportedly did not point him out to the police that evening because she was afraid, but she did tell the police four days later. Five days after the shooting, Sergeant Brodin of the Minneapolis Police Department similarly identified defendant as having made attempts to approach the crime scene on the evening of the shooting. At trial Brodin testified that defendant made three separate attempts to get to the crime scene.

The police investigation revealed further evidence. Blood was found on the driver's seat of Green's car. A bullet was found lying loose on that seat while a second bullet was found embedded in the backrest of the driver's seat. A third bullet was discovered outside the car near Green's left hand and a fourth bullet was recovered from Green's skull. Four one hundred dollar bills were found in a clump approximately 20 feet from the body, as well as fresh footprints. The police were unable to make casts of the footprints because of the condition of the snow. No more hundred dollar bills were found, either at the scene or on Green's body at that time. However, a single one hundred dollar bill was found in the car the next day.

Dr. Janis Amatuzio, the medical examiner, estimated Green's time of death at about 8:30 p.m. She testified that Green suffered four wounds, two of which could have caused his death. In her opinion, Green died as a result of "multiple traumatic injuries from gunshot wounds to the head and into the abdomen." Based on her examination, the doctor concluded that the major wound to the abdomen was sustained while Green was still inside the car. Although that wound was potentially lethal, she stated that it would have "taken a period of time for the decedent to have bled enough to have caused his death," and, after sustaining that wound, the victim could have walked or otherwise asserted physical energy to the extent of getting out of the car, running or fighting. In contrast, the head wound, which was inflicted from a distance of less than six inches, would have caused almost immediate immobility.

Based on the police investigation, an arrest warrant was issued for defendant about February 17, 1982. Defendant voluntarily turned himself in on February 26 and gave the following statement to the police concerning his activities on the evening in question. He had seen Green at the Elk's Club on two separate occasions earlier that day, but did not see Green with a large amount of money on either occasion. That evening, while walking in the area of Knox and 12th Avenue North, he saw Green seated in his vehicle with Annie Hudson. He approached Green, who agreed to give him a ride to 707 Oliver Avenue North. After Hudson got out of the car, he moved from the rear seat into the front seat, and Green drove him to that address. When he arrived there, several people were allegedly present. He stayed about 30 minutes to a hour and then left with two persons to buy some marijuana. After doing so, he went to his sister's

house. Later that evening, he returned to 707 Oliver Avenue with his girl friend, and a person named Jerry Straub drove them to Chicago. At trial, defendant's alibi was supported in part and disputed in part.

The following issues are presented:

(1) Whether there was sufficient evidence to convict defendant of first-degree murder in violation of Minn.Stat. § 609.-185(1).

(2) Whether the trial court committed prejudicial error by denying defendant's motion to prohibit the state from using a prior murder conviction to impeach him if he testified.

(3) Whether the trial court committed prejudicial error by denying defendant's motion for a continuance.

■ 1. In determining the sufficiency of the evidence, this court views the evidence in the light most favorable to the state and decides whether the jury reasonably could have found defendant guilty of the crime charged. *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). First-degree murder is committed under Minn.Stat. § 609.185(1) when a person "causes the death of a human being with premeditation and with intent to effect the death of such person * * *." Defendant argues that the evidence was insufficient to show that he committed the act of killing Green and that, in any event, it is insufficient to show premeditation and intent.

■ With respect to identifying defendant as Green's murderer, the state's evidence essentially rested on the eyewitness identification of a single witness, Cynthia Mansaray. Recently, in *State v. Walker*, 310 N.W.2d 89, 90 (Minn.1981), this court stated:

> Although it is commonly stated that uncorroborated eyewitness identification testimony of a single witness is sufficient to support a guilty verdict, we have recognized that not all single eyewitness cases are the same and have emphasized that when the single witness' identification of a defendant is made after only fleeting or limited observation, corrobo-

ration is required if the conviction is to be sustained.

Mansaray witnessed the events from her bedroom window, which was approximately 85 feet away. The shooting occurred at night and, according to her, the area was lit only by streetlights which reflected off "fairly new snow." She claimed to have observed the suspect's face for a "minute or minute and a half" after he shot Green, as he stood by the body and looked toward her house. At trial, she testified that she had seen defendant on several occasions during the preceding year, but she did not know his name when the events transpired. Four days after the shooting, she informed the police that she got a good look at the suspect and that she could identify him "to a certain point." Mansaray was subsequently shown a photo lineup consisting of six individuals and she identified defendant as the man who shot Green.

While Mansaray did not have an optimal opportunity to view Green's killer, this court has previously upheld a conviction based on the eyewitness identification of one who observed two suspected burglars for about a minute from a distance of about 80 feet during the early morning hours. *See State v. Burgess*, 290 Minn. 480, 185 N.W.2d 537 (1971). In that case, however, the suspects were taken into custody shortly after the burglary and they conformed to the general description given by the witness with only one insignificant difference. *Id.* at 480–81, 185 N.W.2d at 538. In contrast, it is troubling here that there is no indication that Mansaray described the suspect's physical characteristics beyond his having worn dark pants and a three-quarter length jacket. Yet, Mansaray's identification testimony is not incredible in the circumstances presented. Furthermore, there is some circumstantial evidence that tends to corroborate the identification. Shortly before the shooting occurred, it is undisputed that defendant got into Green's car and they drove off alone. There was also evidence tending to establish that defendant was at the crime scene shortly after the victim was killed. De-

fendant's exculpatory evidence was not strong, and the jury was warranted in rejecting it and in finding that defendant did not leave Green's car until after shooting him. Although the state's evidence was not particularly strong, we find that there exists sufficient evidence from which the jury reasonably could have found that defendant committed the murder.

■ Defendant attacks Mansaray's identification testimony by pointing out alleged inconsistencies between her testimony and other evidence presented at trial, particularly the testimony of Mary Gartrell, another eyewitness. According to defendant, those alleged inconsistencies rendered Mansaray's testimony unreliable as a matter of law. There is no merit to that argument. The resolution of conflicting testimony is the exclusive function of the jury because it has the opportunity to observe the demeanor of witnesses and weigh their credibility. *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn.1980). "Even inconsistencies in the state's case will not require a reversal of the jury verdict." *Id.* Moreover, a plausible explanation for the major discrepancies between the testimony of Gartrell and Mansaray is that they witnessed different aspects of the shooting. On this record, the jury would have been warranted in finding that Gartrell witnessed Green leaving the car after being shot. Then, after Gartrell drove away, Mansaray witnessed someone shoot Green two more times outside the car after the two men exchanged shoves.

Although Gartrell identified someone other than the defendant when shown the photo lineup, that does not compel a conclusion that Mansaray's identification was insufficient as a matter of law. Gartrell witnessed the event while driving a car, a circumstance that makes it much more likely that she would not be able to identify the suspect. Furthermore, as she drove by Green's car, she had to swerve to avoid hitting Green as he got out. Then she did not turn to look at the scene until she had pulled around the corner. She did not remember when she saw the second person

get out of the car and she did not remember whether it was a man or woman. The jury certainly was warranted in giving more weight to Mansaray's positive identification of defendant.

Finally, defendant claims there was strong evidence of another possible assailant. On this record the jury was warranted in rejecting defendant's other assailant theory as being too speculative to create a reasonable doubt.

There is no question that Green's killer intended to kill him. However, the sufficiency of the evidence on the element of premeditation presents a closer question. " '[P]remeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (1982). "[It] indicates a preexisting reflection and deliberation involving more than a mere intent to kill." *State v. Lemire*, 315 N.W.2d 606, 610 (Minn.1982).

■ At first blush, a finding of premeditation would appear to be easily sustainable under an armed robbery motive. *See State v. Kirch*, 322 N.W.2d 770, 773 (Minn. 1982); *State v. Campbell*, 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968). Yet, the jury did not find defendant guilty of intending to kill Green while committing aggravated robbery. Nevertheless, the state argues that a finding of premeditation can be sustained because defendant fired four shots into Green at point-blank range. In the past, this court has inferred premeditation solely from the number of times a weapon is used. *State v. Hare*, 278 Minn. 405, 408, 154 N.W.2d 820, 822 (1967), *cert. denied*, 391 U.S. 925, 88 S.Ct. 1823, 20 L.Ed.2d 663 (1968). More recently, however, we have stated that premeditation may only be inferred "in part from the number of times a weapon is used." *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979); *see also State v. Swain*, 269 N.W.2d 707, 713 (Minn. 1978). Premeditation must be inferred from the totality of the circumstances. *State v. Ulm*, 326 N.W.2d 159, 162 (Minn. 1982).

In the instant case, the jury would have been warranted in finding the following. Defendant shot Green twice from close range while they were both in the car. Then, both men got out of the car and defendant confronted Green and shot him twice more at close range. One of those shots struck Green in the head near his left temple. We have previously emphasized that "[e]xtensive planning and calculated deliberation need not be shown by the prosecution. The requisite 'plan' to commit a first-degree murder can be formulated virtually instantaneously by a killer." *State v. Neumann,* 262 N.W.2d 426, 430 (Minn. 1978); *see also Lemire,* 315 N.W.2d at 610. Furthermore, this court has recognized that premeditation "could well [be] formed in those moments of hostile confrontation between [a] defendant and decedent." *Campbell,* 281 Minn. at 13, 161 N.W.2d at 55. In the circumstances presented, the jury could reasonably have inferred that defendant at least considered, planned or prepared to kill Green between shooting him in the car and then confronting him outside the car. Accordingly, we conclude that there is sufficient evidence to uphold the first-degree murder conviction.

2. Defendant next claims that the trial court prejudicially erred by denying his motion to prohibit the state from impeaching his credibility by means of his 1973 second-degree murder conviction. He claims that ruling denied him a fair trial because it caused him not to testify.

Minn.R.Evid. 609 governs the admissibility of prior convictions for impeachment use.[2] The crucial question presented is whether, under Rule 609(a)(1), the trial court correctly ruled that the probative value of admitting the evidence outweighed its prejudicial effect. We must uphold the trial court's ruling "unless a clear abuse of discretion is shown." *State v. Brouillette,* 286 N.W.2d 702, 707 (Minn.1979).

We have outlined the relevant factors bearing on this issue on numerous occasions in recent years. *See State v. Lee,* 322 N.W.2d 197, 199 (Minn.1982); *State v. Bettin,* 295 N.W.2d 542, 546 (Minn. 1980); *Brouillette,* 286 N.W.2d at 707–08. Several factors present in this case support the trial court's ruling. Even though that ruling may have caused the defendant to avoid testifying, it did not preclude the jury from hearing defendant's story. His version of what happened on the evening in question was presented to the jury when Sergeant Kulseth of the Minneapolis Police Department testified about the statement defendant gave the police approximately two weeks after the murder. Significantly, defendant made no offer of proof to show what, if anything, more he would testify about that was not already before the jury.

Credibility was a central issue in this case and, therefore, there would have been a greater need for the impeachment testimony. *Bettin,* 295 N.W.2d at 546. Although the prior conviction in question has a less direct bearing on credibility than crimes involving untruthful conduct, we have previously emphasized that Rule 609 "clearly sanctions the use of felonies which

---

**2.** Minn.R.Evid. 609 provides in pertinent part:
(a) General rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or (2) involved dishonesty or false statement, regardless of the punishment.
(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

are not directly related to truth or falsity for purposes of impeachment, and thus necessarily recognizes that a prior conviction, though not specifically involving veracity, is nevertheless probative of credibility." *Brouillette*, 286 N.W.2d at 708. Underlying Rule 609 is the principle that impeachment by a prior conviction assists the jury to judge better the credibility of a witness by affording it the opportunity to view that person as a whole. *Id.* at 707.

The key factor weighing against admission of the prior conviction was the fact that the prior crime was similar to the crime with which defendant was charged. As such, there is a greater danger that the jury may use the evidence substantively, rather than for impeachment purposes only. *Bettin*, 295 N.W.2d at 546. However, the trial judge informed defendant that, should he testify, he would give a cautionary instruction directing the jury to consider the prior conviction only for impeachment purposes. In the past, we have recognized that "[s]uch an instruction adequately protects defendant against the possibility that the jury would convict him on the basis of his character rather than his guilt." *Brouillette*, 286 N.W.2d at 708. Accordingly, for the above reasons, we hold that the trial court did not abuse its discretion by denying defendant's motion to prohibit the use of his prior conviction.

3. At a pretrial hearing on June 24, 1982, defendant moved for a continuance of a "week or two" on the ground that some unnamed uncooperative witnesses might be willing to testify, if the defense were given more time to persuade them. The trial court denied the motion because he had "no assurance that if [he] gave [defendant] the continuance that [the witnesses] would be available in any event at that time." Noting that the trial would take a while to develop, he stated, "Hopefully you can get any additional witnesses to cooperate with your investigator between now and when they are called to testify maybe next week or in a week and a half." Trial then began on June 28 and culminated on July 1, earlier than expected.

On appeal, defendant claims the trial court's ruling denied him a fair trial. The decision to grant or deny a continuance lies within the discretion of the trial judge. *State v. Turnipseed*, 297 N.W.2d 308, 311 (Minn.1980). In determining whether the trial court soundly exercised its discretion, this court must examine the circumstances before the trial court when the motion was made to determine whether the defendant was so prejudiced in preparing or presenting his defense as to materially affect the outcome of the trial. *Id.* Defendant essentially argues that he was prejudiced because he had only three witnesses at trial. However, he failed to specify who the other witnesses might be; he made no offer of proof concerning what their testimony might be or how it would be critical to the defense; and he gave no good reason why the witnesses would be more willing to cooperate if given more time. The trial was held more than three months after the indictment. Accordingly, we hold that the trial court did not abuse its discretion here.

Affirmed.