**STATE of Minnesota, Respondent,**

v.

**James G. WINNINGHAM, Appellant.**

**No. C3–86–1379.**

Court of Appeals of Minnesota.

May 26, 1987.
Review Denied July 15, 1987.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, William F. Klumpp, Jr., Spec. Asst. Attys. Gen., St. Paul, Richard Arney, Washington Co. Atty., Stillwater, for respondent.

C. Paul Jones, State Public Defender, Elizabeth B. Davies, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and SEDGWICK and LANSING, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

A jury convicted appellant James G. Winningham of one count of use of minors in sexual performances in violation of Minn. Stat. § 617.246, subd. 2 (1984), and one count of possession of photographic representations of minors in violation of Minn. Stat. § 617.247, subd. 4 (1984). On appeal Winningham claims *inter alia* that he was denied his constitutional right to a fair trial because certain exhibits, which had been previously ruled inadmissible as "highly prejudicial," were inadvertently delivered to the jury as they deliberated. We agree and reverse.

## FACTS

James Winningham rented a room in Stillwater, Minnesota, from mid-April 1984 until mid-July 1985. During that time the other residents of the house were the landlord, the landlord's future wife and another renter. Each of the other three residents was divorced, and each had two children by their previous marriages. All six of the children stayed at the residence approximately two weekends each month.

On July 15, 1985, after Winningham had moved, he told an officer of the Stillwater Police Department, while being questioned about an unrelated matter, that he had a collection of pornography. He gave the detective a key to his room and told him where he could find it. The police officers found an album containing numerous photographs, many of which were of the clothed and unclothed genitals of young children, who were later identified as the children who had stayed at the Stillwater residence when Winningham lived there. Winningham was charged with "use of minors in sexual performance" in violation of Minn.Stat. § 617.246, subd. 2 (1984), and

"possession of photographic representations of minors" in violation of Minn.Stat. § 617.247, subd. 4 (1984).

At trial the State attempted to show Winningham's motive in committing the charged offenses by introducing letters he allegedly had written to commercial pornographers. The letters spoke in vulgar and graphic terms of the writer's fondness for photos of "baby dolls" or "little girls" in various stages of undress and erotic posture. Following a mid-trial hearing, the court ruled that the letters were inadmissible at trial. The court noted that the State's evidence showing the letters were written in Winningham's handwriting was "weak" and that the letters, which the court characterized as "highly prejudicial," would be "more prejudicial than probative." The court also noted the exhibits were not necessary to bolster the State's already "very strong" case.

About five minutes after the case had been submitted to the jury, the court's clerk discovered that the excluded letters had been delivered to the jury room along with the evidence that had been admitted. The correspondence was then found spread over the entire length of a table in the jury room. After the excluded evidence was removed, the trial court polled the jurors individually. Each of the jurors admitted having viewed the excluded evidence, and at least five of the jurors admitted reading at least a portion of one or more of the exhibits. One juror testified, "I read one paragraph in one letter, and it was enough." When asked by the court what he meant by "enough," the juror replied, "[w]ell, it described some photographs that he had received from someone and I made the comment, '[had] anybody read any of this garbage?'" The juror also testified that "there were a couple other comments" by other jurors, and one juror had commented, "[i]t's pretty bad, isn't it?" or "something like that." Another juror testified that some of the jurors had commented that the exhibits were "filthy."

The court then instructed the jury that the excluded documents were not a part of the case. Each juror affirmed that he or she could disregard the excluded evidence and reach a fair verdict. The jury resumed its deliberations and, about two and a half hours later, returned verdicts of guilty as charged. After the jury retired, Winningham moved for a mistrial. The court denied his motion, explaining:

I think, based on the fact that it certainly was an inadvertent error, that it was only on the table two or three minutes from the testimony of various jurors, and that each of them indicated that either they really hadn't seen much at all in it, or if they had seen some small portion of it, they could disregard that matter in reaching their final decision, it appears that what the jurors were attempting to do is merely compare handwriting on a tag to see if it was the same and hadn't reached beyond that to explore the contents of any of these documents, I will find that I'm satisfied that the jury can set any of this aside in their mind and reach a fair and just verdict, so the motion by the defense is denied.

Winningham's motion for a mistrial was renewed at a sentencing hearing and was again denied by the trial court. Winningham was subsequently sentenced to a prison term of 42 months for the felony offense of use of minors in sexual performances and to a consecutive 12–month sentence for the gross misdemeanor offense of possession of photographic representations of minors. Winningham appeals from the judgments of conviction and the sentence imposed.

## ISSUE

Was Winningham denied his constitutional right to a fair trial because the jury was inadvertently allowed to view evidence that previously had been ruled inadmissible as "highly prejudicial?"

## DISCUSSION

"The exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury * * *." *State v. Cox,* 322 N.W.2d 555, 558 (Minn.1982) (citing *Parker v.*

*Gladden,* 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966)). In *Cox* the supreme court set forth four factors to be considered in cases involving potentially prejudicial matters that inadvertently come before a criminal jury:

> The relevant factors to be considered by this court, in an independent evaluation of the verdict, are the nature and source of the prejudicial matter, the number of jurors exposed to the influence, the weight of evidence properly before the jury, and the likelihood that curative measures were effective in reducing the prejudice.

*State v. Cox,* 322 N.W.2d at 559.

At least three of the four factors dictate reversal of Winningham's conviction. First, the nature of the evidence was described by the trial court itself as "highly prejudicial" and "more prejudicial than probative." The prejudicial nature of the evidence was also demonstrated by the jurors' comments describing the letters as "filthy" and "garbage."

The source of the evidence also dictates a reversal of Winningham's conviction. As this court recently held in *State v. Cash,* 391 N.W.2d 875, 880 (Minn.Ct.App.1986), "[e]ach party bears responsibility for its own exhibits." In that case the trial court ordered certain portions of an interrogation transcript to be deleted before it was delivered to the jury room, but the court clerk failed to delete all of the statements that had been ordered suppressed. This court held that prejudicial error had occurred, because "[i]t was incumbent on the State, as the party offering the exhibit, to insure that the exhibit offered into evidence did not contain the tainted phrases the court had ordered stricken." *Id.* Similarly, it was the State's responsibility here, as the source of the exhibits, to make sure the inadmissible evidence was not delivered to the jury.[1]

The number of jurors exposed to the tainted evidence also supports a finding of reversible error: all of the jurors were exposed to the exhibits; the exhibits "were strewn up and down the entire length of the jury deliberation table;" at least five jurors admitted reading at least a portion of one or more of the letters, and the remaining jurors admitted to looking at or glancing at the exhibits. Although many jurors testified that they had only attempted to compare the handwriting on the letters or envelopes with Winningham's handwriting on other exhibits, two jurors testified that they had heard comments describing the letters as "pretty bad" or "filthy." Even if some jurors did not actually read the letters, they would have heard their fellow jurors' strong comments.

Finally, we find it very unlikely that the trial court's curative measures, although properly administered, could realistically have been effective. Given the inflammatory nature of the evidence in question, as shown by both the trial court's characterization of the evidence and the jurors' comments, "[w]e would ignore reality and the common sense of a jury to conclude that [the] jury [was not] unduly prejudiced" by its inadvertent viewing of the letters. *Id.*

In light of the standard enunciated in *Cox* and the precedent of *Cash,* we hold that Winningham was denied his constitutional right to a fair trial. Therefore, his conviction must be reversed and the case remanded for new trial. Our holding makes it unnecessary to address any of the additional issues raised by the parties.

**DECISION**

Reversed and remanded.

---

1. We find no merit in the State's attempt to distinguish *Cash* on the basis that "the inadvertent delivery of the excluded evidence to the jury room was simply a mistake for which neither party can be held responsible." The delivery of the tainted evidence to the jury in *Cash* was also inadvertent. *See Cash,* 391 N.W.2d at 880 ("No one appears to have acted wilfully but the harm was done.")