**STATE of Minnesota, Respondent,**

v.

**Daniel J. MALASKI, Appellant.**

**No. C1–82–240.**

Supreme Court of Minnesota.

Feb. 25, 1983.

C. Paul Jones, Public Defender, and Sally A. Scoggin, Sp. Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., Norman B. Coleman, Jr., and Richard D. Hodsdon, Sp. Asst. Attys. Gen., St. Paul, Larry Mickelberg, County Atty., Moorhead, for respondent.

KELLEY, Justice.

Early on April 29, 1981, defendant killed his friend, 28-year-old Elmer Egerdahl, with one shot from a military rifle at their house in Dilworth, which is in Clay County. Defendant was subsequently charged with second-degree (intentional) murder. At his trial in November of 1981, defendant claimed that he did not intend to kill Egerdahl and that the shooting was justifiable. The trial court submitted second-degree murder, first-degree (intentional heat-of-passion) manslaughter, and second-degree (culpably negligent) manslaughter. Minn. Stat. §§ 609.19, 609.20(1) and 609.205(1) (1982). The jury, which began its deliberations at 2:55 p.m. on November 11, did not return with its verdict until 10:50 p.m. the following day. It found defendant guilty of first-degree manslaughter. The trial court sentenced defendant to 43 months in prison, which is the presumptive sentence for the offense in question by a person with a criminal history score of zero at the time of sentencing.

On appeal from judgment of conviction, defendant seeks an outright reversal of his conviction or a reduction to second-degree manslaughter on the ground that the state failed to prove that the killing was either intentional or unjustified. Alternatively, he seeks a new trial on the ground that the trial court's instructions, to which defense counsel did not object, were inaccurate and confusing with respect to intent and self-defense. We reverse and remand for a new trial.

The victim had a history of violent and irrational behavior. An incident that occurred in Pennsylvania in 1974 exemplifies this. On that occasion the victim chased his wife out of their apartment with a gun and

refused to let her take their child with her. When police responded to a complaint and went to the apartment and confronted him, he told them that he had thought of shooting them when he saw them coming. After handing the child to the police to give to his wife, he said to tell her that if she ever came back he would blow her brains out. After the police went outside, he opened a window in the apartment and sat in it, holding his rifle. At this point police returned to the apartment, got the gun and ammunition from him, and took him to a state hospital. His hospitalization ended a couple months later when he escaped.

In 1977 Moorhead police were called to investigate a domestic dispute involving Egerdahl, who was reportedly armed with a knife. Egerdahl "came at" one of the officers and the officer, not sure whether Egerdahl was armed, maced him. The officer then tried but failed to hold him. It took three officers to subdue him. One of these officers testified at defendant's trial that Egerdahl had acted "quite irrationally" on that occasion and that he was "tremendously strong."

Defendant became friends with the victim in 1978 and shared a residence with him on and off from that time until the victim's death. Defendant was aware of the victim's tendency to become violent when he was intoxicated. For one thing, Egerdahl often bragged about his past acts of violence, saying that he had attacked his brother with an axe or knife, that he had held his ex-wife at gun point in Pennsylvania, that he had escaped from a mental hospital, and that he had once put a knife to his ex-wife's throat. Defendant also witnessed numerous acts of violent irrational behavior by Egerdahl. In November of 1980, while he and a friend were in Seattle with Egerdahl, he witnessed Egerdahl trip a woman in a bar after she claimed that she was next in line at a pool table. In February 1981 Egerdahl killed a puppy with his bare hands as punishment for messing the floor. On one occasion Egerdahl assaulted defendant in a bar and on other occasions he assaulted friends and/or threatened to kill them. More often Egerdahl would go into an irrational rage and would throw objects and overturn or break pieces of furniture while citing his grievances and recounting his past acts of violence. On one such occasion one of his friends told him that he should watch so that he did not kill someone some day. On another occasion Egerdahl told a friend that if he ever died he would "die high."

In April of 1981 defendant, the victim, and a mutual friend, Ron Perrault, rented a small house in Dilworth. Defendant and Perrault each took rooms on the second floor and Egerdahl took a room on the first floor. They then sublet the basement to defendant's girl friend, Sue Peterson, a young woman who formerly had dated the victim.

Early on the evening of April 28, 1981, defendant, Perrault, Peterson and a young woman named Diane Martin, in whom the victim had expressed a romantic interest, began watching television. Egerdahl apparently became irked that Martin was sitting next to Perrault. While they were sitting there, Egerdahl went into the "weight lifting room," where he and defendant regularly lifted weights, and grabbed a dart board, which he threw out in front of the couch, saying, "Let's play darts." When Peterson said that they could not play darts because they did not have darts, Egerdahl took his machete, unsheathed it, and threw it in front of the couch and said that they could use that. Egerdahl then began ranting and raving and knocking over furniture, as he had done in the past so often. Defendant told Peterson and Martin that they had better leave. As they were leaving, Egerdahl called Peterson a number of names and told her never to come back. At one point he held the machete to defendant's neck. Perrault testified that Egerdahl seemed to be "taking it all out" on defendant, accusing defendant of "playing games" with his mind. Egerdahl also complained about not having a job. A number of times he jabbed the machete into the floor. Defendant and Perrault eventually calmed him down, but not before he had chopped the legs off one

chair with the machete. It is undisputed that defendant remained calm during this entire outburst and did not even raise his voice. This apparently was defendant's standard response to this sort of behavior by Egerdahl.

Later that evening defendant and Perrault took Egerdahl to a bar, where they also had been late that afternoon. Egerdahl drank a number of mixed drinks, then left in defendant's van, not returning until about midnight. A witness testified that on his return Egerdahl was loud and was "picking" on everybody. This witness testified further that Egerdahl told her he was on "acid." At 12:45 a.m. the three men left the bar and returned to the house. Egerdahl drove the van at high speeds and in a reckless manner.

Once at the house, Egerdahl began gulping down beers and began ranting and raving again. At one point he smashed a beer down on the counter in the kitchen and tore the cupboard top off. Defendant called Peterson, who was awakened by this in the basement, and told her that she should stay downstairs.

Defendant then went upstairs, got out his rifle, which is a British .303 military rifle, and loaded it. He then left it and went back down to the main floor. Egerdahl became even angrier, and so defendant and Perrault decided that they should go upstairs to bed and let him cool off by himself downstairs. Asked why he did not call the police, defendant said that he feared that Egerdahl would really blow up if he did that.

Defendant testified that once he was upstairs he heard Egerdahl begin to make animal noises and also could tell that he was still tearing things up. He testified that he also heard him go to the door to the basement and threaten "to get" Peterson and everyone else. Perrault testified that he did not hear any threats, but Peterson testified that she did.

Egerdahl apparently went outside briefly, then came back in, still ranting and raving as he advanced up the steps. A moment earlier Perrault had seen defendant with the gun and told him to put it away. Defendant apparently had gone back to his room but came out again when he heard Egerdahl, who was screaming, coming upstairs. As Egerdahl came up, defendant stood at the top and told him to stay down. Perrault testified that he heard Egerdahl utter a profanity and that he heard defendant say, "Stay down, please." Defendant testified that Egerdahl said that he should pull it, that it was him or defendant. Defendant admitted knowing that Egerdahl did not have the machete but he testified that Egerdahl's hands were behind his back. He testified that although he and Egerdahl generally were of equal strength, he knew that when Egerdahl was in such a rage, Egerdahl was three times stronger than he normally was.

All this took just seconds and, when Egerdahl did not stop but kept coming, defendant fired one shot. The shot went through Egerdahl's mouth, killing him instantly. It was later determined that defendant was at least 3 feet away from him when he fired the gun.

The autopsy revealed that Egerdahl had a blood alcohol content of .17%. The tests used failed to detect any "acid" or Ephedrine, which is an "upper," in Egerdahl's blood, but did detect the presence of Ephedrine in Egerdahl's urine. Eighty tablets of Ephedrine were found in Egerdahl's pocket. The state did not rule out the possibility that Egerdahl also was on "acid." There was expert testimony by a defense witness that the tests used by the state's expert were not the best tests for determining if any "acid" or Ephedrine was in the blood. The defense expert testified that Ephedrine and alcohol, when taken together, had a synergistic effect and would have removed Egerdahl's inhibitions.

■ 1. Defendant's first contention is that the state failed to establish that the killing was either intentional or unjustified.

We believe that the jury could infer that the killing was intentional. By his own admission, defendant was just a few feet away from Egerdahl when he fired the gun.

He admitted that he fired the gun but claimed no intent to kill. However, the jury was free to reject this testimony and to infer from the act (firing a high-powered rifle at another person at close range) and other circumstances that the killing was intentional.

The issue whether the evidence was sufficient to prove lack of justification is closer, but we conclude, based on the testimony of Perrault, that the evidence was sufficient in this respect also.

2. Defendant's second contention is that the instructions, to which defense counsel did not object, were inaccurate and confusing with respect to intent and self defense.

■ The general rule is that if defense counsel fails to object to error at trial, the defendant thereby is deemed to have forfeited his right to have this court consider that error on appeal. However, there are exceptions to this rule. Thus, even if a defendant's trial counsel has failed to object at trial and "preserve" the claim of error for appeal, we are still free to consider the claim on appeal if the error was "plain error affecting substantial rights" or if the claim relates to error in "fundamental law" in the jury instructions. Minn.R.Evid. 103(d). And in *State ex rel. Rasmussen v. Tahash,* 272 Minn. 539, 551, 141 N.W.2d 3, 11 (1965), we stated that we could reverse on the basis of trial error notwithstanding a failure by the defense counsel to object to any of the error if failure to reverse would "perpetuate a substantial and essential injustice in the sense that as a result an innocent man may have been convicted."

In this case the trial court made it clear that intent to kill was a necessary element of both second-degree murder and first-degree manslaughter but not of second-degree manslaughter. It also made clear the distinction between second-degree murder and first-degree manslaughter. The court gave the following instructions on self-defense:

> In addition to the plea of not guilty, the defendant has in this case interposed what we call an affirmative defense to the crime of murder in the second degree, manslaughter in the first degree, man-

slaughter in the second degree. And that is that in shooting Elmer Egerdahl he, the defendant, acted in self defense and that his act is therefore a case of justifiable homicide. Under the law in Minnesota—and in this connection I should point out that the Statute provides that the intentional taking of the life of another may be lawfully justified in resisting or preventing an offense which the actor reasonably believes exposes him to great bodily harm or death or preventing the commission of a felony in his place of abode.

> Now in connection with this claim that the defendant acted in self defense, there are certain conditions that must exist. And all of them must concur to constitute self defense. One, the defendant in committing the act of killing must not have been the aggressor or the person provoking the incidents. I think that this is very plain. Obviously, if the defendant provoked it, it could not be considered, self defense. It has to be provoked by the other person, and I don't think that that's any great issue in this lawsuit.

> Secondly, the defendant must have actually believed that he was in imminent danger of great bodily harm or being killed, and that it was necessary to kill Elmer Egerdahl in order to avert serious or great harm or death to himself.

> And, three, it must appear that such belief on the part of the defendant must have been reasonable under the circumstances. In other words, the belief that he was in imminent danger of great bodily harm or death must be based upon facts which would reasonably justify that conclusion.

> Four, the defendant's election to kill must have been under circumstances as to prompt a reasonable man to make the same decision in the light of the danger to be apprehended. Now under this circumstance, the defendant has the duty to retreat or avoid danger if this was reasonably possible. Thus, in deliberating and weighing the evidence in this case you conclude that the conditions existed

that the defendant acted honestly and in good faith and actually and reasonably believed that he was in imminent danger of great harm or death and that he could not avert this danger by retreating, or perhaps you could use the term running away from it reasonably, then you would conclude that the defendant's act was justified, and you would find him not guilty of murder in the second degree; or for that matter, guilty of any of the lesser included crimes.

When the defense or affirmative defense known as self defense issue is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in that respect.

The court gave the following special instructions on intent:

Now I should point out again that one of the elements of murder in the second degree and manslaughter in the first degree is the defendant's intent to cause the death of a person. That is, the State must prove beyond a reasonable doubt in proving either of these two offenses, murder II or manslaughter I, that the defendant intended to cause the death of the person involved. And there's no hard or fast rule that I can give you as far as defining the meaning of the word "intent" because intent is a state of mind. It might, however, be inferred from the conduct of the person or the surrounding factors or the circumstances in connection with the acts which took place in question. It might be inferred that a person intends the act which he voluntarily performs.

The word "intentionally" means that a person either had an opportunity to do a thing and caused the result specified or agrees that if his act is successful will cause that result.

In addition, the person must have knowledge of those factors which are necessary to make his conduct criminal and which are set forth after the word "intentionally" as it's used in the statute.

I should point out that the facts may be proved or established by evidence of other facts from which natural or logical inferences may be drawn therefrom. And that is what is sometimes referred to as circumstantial evidence. The state relies on both direct and circumstantial evidence to prove the defendant's guilt. The law makes no distinction between circumstantial evidence and direct evidence as to the degree of proof required. It respects each for such convincing proof as it carries, and accepts each as a reasonable method of proof. Either one, direct or circumstantial evidence, will support a verdict of guilty if it carries the convincing quality required, and that is proof of the essential elements of the crime beyond a reasonable doubt.

What inferences are to be drawn from the evidence is a matter for you, the jury. And it's for you to determine what inferences may be naturally and logically drawn from the factual evidence in the case. If the facts surrounding and attendant upon the occurrence of the act in question are such that it's natural, logical and reasonable for you to draw inferences and conclusions therefrom, you may draw such inferences. You should exercise great care and consideration in weighing the facts and in drawing inferences and conclusions therefrom. You must indulge in fair and natural occurrences and inferences and not in foreign or artificial ones. Where two reasonable inferences may be drawn from the same facts, one consistent with guilty and the other consistent with innocence, the defendant is entitled to the inference which is consistent with his innocence.

As we indicated earlier, the jury began its deliberations at 2:55 p.m. on November 11, 1981. At 10:30 p.m. that day the jury asked and got the court to repeat the instructions on self defense. The following proceedings then occurred:

A JUROR: May I ask a question?

THE COURT: Yes.

A JUROR: It has to do with this self defense necessitating intention to kill.

THE COURT: Well, yes, it normally does. That is, self defense normally con-

templates that a person commits, intends the act which is committed. That gets back to the definition of intention again, and I think I gave that to you in the original instructions. Intent to kill exists in murder II and in manslaughter I, but not in manslaughter II. But self defense, it applies to all three of these.

A JUROR: My main question though was concerning your image of the word "kill." And number two, should that be, he believed it was necessary to kill or to shoot?

THE COURT: Well, to kill.

 The main instructions on intent (particularly the instruction that "It might be inferred that a person intends the act which he voluntarily performs") were not model instructions but, looked at as a whole and in the context of the other instructions, they were adequate.

The main instructions on self defense were defective in that the court failed to modify them to fit the contentions of the parties. In a typical case of self defense resulting in death, where the defendant admits that the killing was intentional but claims that it was justified, it is appropriate for the instruction to state that the defendant's "election to kill" must have been reasonable. However, in this case the defendant did not admit that he intended to kill the victim but instead claimed that he merely elected to defend himself by shooting the victim without intending to kill. Under the circumstances, the court's instructions should have indicated that the defendant's "election to defend himself in the way he did" must have been reasonable.

When the jury returned to question the court about this latter point, the court's response was that "self defense normally contemplates that a person * * * intends the act which is committed." It is quite possible that the jurors, who are not trained in the law, might have taken this to mean that by claiming self defense the defendant in effect was admitting intent or should be deemed to have admitted intent. The jury could have interpreted it to mean that the defense of self defense applied if the de-

fendant did not admit that he had the requisite intent to kill. In either case, the misconception would have further fit in with the prosecutor's argument to the jury that defendant's claim of self defense was inconsistent with his claim of lack of intent. That is, the "clarification" of the self-defense instructions might have confused the jurors as to their duty to determine intent from all the circumstances or might have confused the jurors as to the applicability of self defense in a case in which the defendant does not admit intent to kill.

We have no way of knowing what the jury's understanding of the law was. However, based on what transpired and on our belief that in this case the slightest error of this sort could have significantly affected the verdict, we hold that a new trial is required.

Reversed and remanded for a new trial.