**STATE of Minnesota, Respondent,**

v.

**Lonnie Dale SANDERS, Appellant.**

No. CO–83–1812.

Supreme Court of Minnesota.

Oct. 18, 1985.

C. Paul Jones, Minnesota State Public Defender by Mollie G. Raskind, Deputy State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Janet A. Newberg, Sp. Asst. Atty. Gen., St. Paul, Michael T. Milligan, Cass County Atty., Walker, for respondent.

COYNE, Justice.

Defendant, Lonnie Dale Sanders, was found guilty by a district court jury of second-degree felony murder, Minn.Stat. § 609.19(2) (1984),[1] for the stabbing death of his brother and was sentenced by the trial court to an executed prison term of 116 months. Defendant appealed to the Court of Appeals, contending (1) that his conviction should be reversed outright because the state failed to prove beyond a reasonable doubt that the killing was unjustified or (2) that he should be given a new trial because the trial court erroneously admitted certain autopsy photographs, gave inadequate and misleading instructions on self-defense, and improperly coerced defendant into agreeing to the trial court's sending the jurors home for the night after they had begun their deliberations. The Court of Appeals granted defendant a new trial, concluding that the trial court coerced defendant into agreeing to send the jurors home for the night, that this created a presumption of prejudice, and that a new trial was therefore necessary. *State v. Sanders*, 355 N.W.2d 200 (Minn.App.1984). Concluding otherwise, we hold that defendant received a fair trial and was properly found guilty of second-degree felony murder. Accordingly, we reverse the decision of the Court of Appeals and reinstate the judgment of conviction.

At 1:32 a.m. on January 22, 1983, the dispatcher for the Cass County Sheriff's Office received a call from a woman who did not identify herself asking how long it would take for an ambulance to get to Whipholt. After receiving the information, the woman said she would call back if an ambulance was needed. At 1:44 a.m. the dispatcher received another call, this one asking that an ambulance be sent to the Sanders' residence in Whipholt because someone had been cut. The dispatcher paged the ambulance personnel in Walker, which is 11 miles from Whipholt, and they left at 1:54 a.m., arriving at 2:05 a.m.

They were directed into the residence of defendant, where they found the victim, 25-year-old Lew Sanders, lying dead on his back on the living room floor.

The ambulance attendants found a small amount of blood on the left side of the victim's back. An autopsy would later show that the victim had a blood alcohol concentration of .20 at the time of his death and that he died from a single 4 inch deep stab wound in the back below the shoulder blade, a wound that lacerated the left lung. Neither the attendants nor the investigators who arrived on the scene saw any knife in the house.

The victim's wife, Sheryl Sanders, told the investigators, and later testified at trial, that the victim was in "good spirits" when he left their place for defendant's place around 12:30 a.m. The husband of one of the sisters of defendant and the victim said, and later testified, that the victim had pounded on his door on the way to defendant's place at 12:30 a.m.

The sheriff talked with defendant in defendant's parents' house later in the day. Defendant said that the victim and he had spent the previous day together and finally returned to their respective residences in Whipholt sometime between 11:30 p.m. and midnight. He said that a short time later the victim "came barging in," picked up a knife from the kitchen table, and said he was going to kill defendant. Defendant said that he knocked the knife out of the victim's hand and they started wrestling. He said that during the fight the victim picked up the knife and that the next thing he knew the victim "was cut and just laid back."

Defendant accompanied the sheriff to Walker and gave a taped statement. After giving the statement, defendant told the sheriff that his mother had told him to get rid of the knife and that he would find it for the sheriff. Later defendant and the

1. Under this section, one is guilty of felony murder if one "[c]auses the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence."

sheriff drove to defendant's place, where the sheriff found the knife in the snow 70 to 80 feet from the house. The knife was a large one with an 8-inch blade, the point of which was missing. Asked what happened to the point, defendant said that after he stabbed the victim, he pulled the knife out of his body and stabbed it into the floor. The sheriff and defendant then found the missing point, which was ¾ inches long, and removed it from the floor with pliers. An expert from the Minnesota Bureau of Criminal Apprehension subsequently examined the knife, finding blood of the victim's type on the blade and blood of defendant's type on the handle.

Defendant's trial testimony mirrored his statement to the sheriff. He testified that he had no recollection of actually pushing the knife into the victim. He admitted, however, that he "must have stabbed" the victim and he claimed that he was justified in doing so because "I was fighting for my life." Defendant's general credibility was impeached by a prior conviction for aggravated robbery.

Defendant's girl friend, Ruth Spencer, who was the only other person present in the house at the time of the killing, corroborated defendant's testimony that the victim barged in to the house and said he was going to kill defendant. She also claimed that she saw the victim standing in the living room holding a knife. She testified, as did defendant, that defendant then told her to go back into the bedroom because he did not want her involved and that he would take care of the matter. She testified that defendant and the victim fought for 5 to 10 minutes, after which defendant told her that he had stabbed the victim and that she should call an ambulance. Spencer's credibility was significantly impeached by her admission that she had lied under oath on another occasion.

1. Defendant's first contention in the Court of Appeals was that his conviction should be reversed outright because the evidence was insufficient to establish that the killing was not in self-defense. The Court of Appeals rejected this contention,

holding that the evidence was sufficient. We agree.

Defendant, although denying any memory of the actual stabbing, claimed that the victim unjustifiably attacked him with the knife and that he had no choice but to defend himself against the victim. Defendant contended that he was justified in stabbing the victim. Defendant's girl friend, although claiming that she remained in the bedroom during the entire fight, corroborated defendant's testimony that the victim was the aggressor.

The jury, however, was not obliged to credit the testimony of defendant and his girl friend but was free to consider and weigh all the evidence, and to draw reasonable inferences therefrom, in reconstructing the incident and in determining whether defendant acted reasonably. Significant facts on which the jury could rely in ultimately concluding that defendant did not act in self-defense include the fact that (a) the victim was in "good spirits" when he left his own house; (b) the victim was the same size as defendant; (c) the victim was severely intoxicated, whereas defendant apparently was not; (d) the victim was unarmed when defendant stabbed him; (e) defendant stabbed the victim in the back; (f) defendant stabbed the victim with such force that the knife penetrated the victim's back by 4 inches; (g) after stabbing the victim, defendant removed the knife and stabbed it into the floor with apparent significant force; and (h) before the police arrived defendant removed the knife from the floor and, either then or later, threw the knife into the snow 70 to 80 feet from his house. We believe that these and other facts, when considered together, provided sufficient evidentiary support for the jury's determination that the stabbing was unnecessary and unjustified.

2. Defendant's alternative contention in the Court of Appeals was that he should be given a new trial because the trial court erroneously admitted certain autopsy photographs, gave inadequate and misleading instructions on self-defense, and improperly coerced defendant into agreeing to the

trial court's sending the jurors home during an overnight recess in their deliberations. We address these issues in the order in which the alleged errors occurred, reserving until last the issue on which the Court of Appeals based its award of a new trial.

(a) Approximately 85 photographic slides were taken during the autopsy. Eighteen of these were admitted into evidence to illustrate the testimony of the pathologist who conducted the autopsy. Of the 18, some showed the stab wound from different angles, some showed internal damage caused by the stabbing, some showed bruises and teeth marks on the victim's arm and some showed bruises on the inside of the victim's scalp. Defense counsel objected to 11 of the 18. The trial court overruled the objections.

■ Defendant argues that the slides lacked probative value on the issue of self-defense, which he maintained was the only real issue for the jury. He argues further that any probative value was outweighed by the potential of the slides for creating undue prejudice, and that pursuant to Minn.R.Evid. 403 the trial court should have excluded the pictures. The Court of Appeals noted the possible prejudicial effect of the autopsy slides, especially where many of the slides may be duplicative and merely cumulative and suggested reference to Rule 403 of the Rules of Evidence on retrial. 355 N.W.2d at 204.

In *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950), we stated:

Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal descrip-

tion of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day when pictures are a common and recognized medium for the accurate portrayal of objects and events.

We have reaffirmed this statement in a number of cases, including *State v. Tinklenberg*, 292 Minn. 271, 194 N.W.2d 590 (1972). The trial court's discretion to admit such photographs is structured by the relevancy standard of Minn.R.Evid. 401 and the balancing test of Rule 403.[2]

■ In this case the trial court, fully aware of Rules 401 and 403, concluded that the pictures in question constituted relevant evidence, accurately illustrating the testimony of the pathologist and legitimately assisting the jurors in reconstructing what happened, and that the probative value of the pictures was not outweighed by their potential for creating undue prejudice. We do not believe that the trial court abused its discretion in so concluding. *State v. Nurmi*, 336 N.W.2d 65 (Minn. 1983).

(b) The trial court gave the following instruction on self-defense:

The defendant has introduced evidence that at the time of Lew Sanders' death defendant was acting in self-defense. The law of the State of Minnesota provides that no crime is committed when a person takes the life of another person even if it is taken intentionally, if the defendant's action is taken in resisting or preventing an offense which he reasonably believes exposes himself—in this

2. Minn.R.Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence." As stated in 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5215, at 275 (1978), the word "prejudice" in Rule 403 "does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence" but rather "refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means."

case the defendant Lonnie Sanders—exposes him to death or great bodily harm. And, or if the defendant Lonnie Sanders' action is taken in preventing the commission of the felony of assault in the 1st degree in the defendant's place of abode or home. But in order for a killing to be justified and therefore excused for these reasons, three conditions must be met. First, the killing must have been done in the belief that it was necessary to avert death or great bodily harm. Second, the judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances. And, third, the defendant's election to defend himself must have been such as a reasonable man would have made in the light of the danger to be apprehended and the existence of any alternative way of avoiding the danger. This includes the duty on the part of the defendant to retreat to avoid the danger if reasonably possible. The legal excuse of self-defense is available only to those who act honestly and in good faith. All of these three conditions must be met and the State has the burden of proving beyond a reasonable doubt the absence of justification, that is that the defendant did not act in self-defense. If you are satisfied that the defendant was acting in self-defense as I have defined in these instructions, you should return a not guilty verdict.

This instruction was modeled after CRIMJIG 7.05 and 7.08.

(i) Defendant argues first that the part of the instruction taken from CRIMJIG 7.05 was inappropriate in that it contained language suitable only when the defendant claims he intended killing the victim in self-defense.

We have emphasized in other cases that the trial court must use analytic precision in instructing on self-defense. *See, e.g., State v. Edwards,* 343 N.W.2d 269, 277 (Minn.1984), where we stated that if the defendant claims that he pointed the gun in self-defense but that the shooting was accidental, the language of CRIMJIG 7.05 does not fit and must be modified. In this case the defendant did not claim that the killing was accidental. Rather, he admitted that he must have used the knife to defend himself but that he did not intend to kill the victim. As we held in *State v. Malaski,* 330 N.W.2d 447 (Minn.1983), it is inappropriate in such a case for the trial court to state that the defendant's "election to kill" must have been reasonable; instead, the trial court should state that the defendant's "election to defend himself in the way he did" must have been reasonable. *Id.* at 453.

■ Arguably, the instruction in this case that "the killing must have been done in the belief that it was necessary to avert death or great bodily harm" is language that would better fit a case in which the defendant claimed he intentionally killed in self-defense. However, considering the entire instruction on self defense in the context of the entire case, including the arguments of counsel, we conclude that any technical deficiency in the self-defense instruction in this respect was nonprejudicial.

■ (ii) Defendant concedes that it was appropriate for the trial court to use the language for CRIMJIG 7.08 to the effect that the legal excuse of self-defense "includes the duty to retreat or avoid the danger if reasonably possible." He argues, however, that the use of both CRIMJIG 7.08 and CRIMJIG 7.05, with its condition that "defendant's election to defend himself must have been such as a reasonable man would have made in the light of the danger to be apprehended and the existence of any alternative way of avoiding the danger," excessively emphasized the defendant's duty to retreat. We disagree. CRIMJIG 7.08 was drafted in such a way that it could be given in connection with either CRIMJIG 7.05 (self-defense—causing death) or CRIMJIG 7.06 (self-defense—death not the result). Furthermore, we have approved CRIMJIG 7.08 in a number of cases, including cases in which it was given in conjunction with CRIMJIG 7.05. *See, e.g., State v. Johnson,* 310 N.W.2d 96 (Minn.1981).

(iii) Defendant's final argument with respect to the instruction on self-defense relates to the fact that, after instructing the jury that the state had the burden of proving that defendant did not act in self-defense, the trial court added, "If you are satisfied that the defendant was acting in self-defense as I have defined in these instructions, you should return a not guilty verdict." Defendant argues that the use of this language may have misled the jurors into believing that the defendant had to prove that he acted in self-defense. The language in question is not part of CRIMJIG 7.05, but was added by the trial court. Although we think it preferable that such language not be appended to the instruction, we note that defense counsel himself used similar language in his closing argument.[3] We also note that the trial court, apparently in deference to the views of defense counsel, omitted the sentence when the court reinstructed the jurors on self-defense in response to a question from the jurors during the course of their deliberations. Satisfied that the jurors were not misled into thinking that defendant had any burden of proof on the issue, we hold that any deficiency in the original instruction was nonprejudicial.

(c) Defendant's final contention, and the one on which the Court of Appeals based its reversal, is that the trial court improperly coerced defendant into agreeing to the trial court's sending the jurors home during the overnight recess in their deliberations.

The issue of sequestration of the jury during a criminal trial is governed by Minn. R.Crim.P. 26.03, subd. 5, which provides:

(1) *In the Discretion of the Court.* During the period from the time the jurors are sworn until they retire for deliberation upon their verdict, the court, in its discretion, may either permit them and any alternate jurors to separate during recesses and adjournments or direct that they be continuously kept together during such period under the supervision of proper officers. With the consent of the defendant the court, in its discretion, may allow the jurors to separate over night during deliberation. The officers shall not speak to or communicate with any juror concerning any subject connected with the trial nor permit any other person to do so, and shall return the jury to the courtroom at the next designated trial session.

(2) *On Motion.* Either party may move for sequestration of the jury at the beginning of trial or at any time during the course of the trial. Sequestration shall be ordered if it is determined that the case is of such notoriety or the issues are of such a nature that, in the absence of sequestration, highly prejudicial matters are likely to come to the attention of the jurors. Whenever sequestration is ordered, the court in advising the jury of the decision shall not disclose which party requested sequestration.

Consistent with the rule and with common practice, the trial court allowed the jurors to separate and return to their respective homes during each of three overnight recesses in the trial as well as during the weekend recess preceding the making of the final arguments and the submission of the case to the jurors. On each of these occasions the court cautioned the jurors against discussing the case with anyone and against listening to or reading media accounts of the trial.

The case was formally submitted to the jurors shortly before noon on Monday, August 8, 1983. At 10:50 p.m. defense counsel asked the court to stop the jurors from deliberating any more that night and to sequester them in a motel overnight. The prosecutor opposed this, arguing that the court should not interfere with the deliberations but should let the jurors continue

---

**3.** Specifically, defense counsel stated:
The State must prove that Lonnie Dale Sanders did not act in self-defense. If you believe that Lonnie Dale Sanders acted in self-defense, you must acquit him. If you don't know, you must acquit him. You can only find him guilty if you're convinced beyond a reasonable doubt based upon proof beyond a reasonable doubt that he didn't act in self-defense.

until 1:00 a.m. The prosecutor agreed that if by then the jurors had not reached a verdict, the trial court should send them to a motel. The trial court asked counsel if they would agree to let the jurors separate for the night immediately, go to their respective homes, and then return in the morning. The prosecutor agreed, but defense counsel refused. At 11:00 p.m. the court sent a message to the jury suggesting that they consider retiring for the night. The jury returned a note saying they wanted to try a little longer.

Meanwhile, the court had a clerk making inquiries about motel rooms for the jurors. This clerk was unsuccessful in finding a sufficient number of rooms in a single motel or hotel to accommodate all 12 jurors. Accordingly, at 11:50 p.m., defense counsel informed the court that "based on the reality of the situation and the lack of other alternatives" and "based upon our feeling that nobody's mind is sharp right now," the defense was consenting to the jurors being sent home for the night. When the trial court said that he would not let the jurors go home if defendant had any reservations about it or if defendant intended to raise the matter after an unfavorable verdict, defense counsel made this response: "Well, when the court asked about reservations, obviously we have reservations on virtually every decision that we make and clearly there is some concern about them going home but there's much more concern about them staying and continuing deliberations right now. Based upon all of those facts we are requesting that they be sent home."

The court then instructed the jurors as follows:

THE COURT: Members of the jury, it is almost midnight and I have decided that you have deliberated long enough for today and so we are going to all retire for the night. Now, ordinarily in situations like this we usually try and find hotel or motel accommodations so that you don't have to be separated, that is, that you're all, can all stay in a single motel unit, different rooms, but we aren't able to find enough motel rooms in one motel to accommodate twelve of you. So I have asked counsel and Mr. Sanders if they would agree that under certain precautions you could separate and go to your homes for the night and return in the morning at eight-thirty to resume your deliberations. And, Mr. Milligan and Mr. Mattson and Mr. Sanders have all agreed that you may separate and go to your homes for the night to return here at eight-thirty and resume your deliberations. At eight-thirty you can go to your jury room but at eight-thirty we will assemble here and then immediately go back into the jury room to resume your deliberations.

At about 8:30 a.m. the jurors resumed their deliberations. The jurors returned with their guilty verdict later that morning, after which defense counsel moved for a so-called *Schwartz* hearing [4] to question the jurors whether they had been subjected to any outside influence during the overnight recess in their deliberations. The trial court denied the motion.

The Court of Appeals concluded that the defendant's consent to letting the jurors separate overnight was coerced and that, therefore, the trial court violated Minn.R. Crim.P. 26.03, subd. 5 by sending the jurors home. Citing its own decision in *State v. Holly*, 350 N.W.2d 387, 389 (Minn.App. 1984), the Court of Appeals concluded that the error was "presumptively prejudicial." 355 N.W.2d at 204. The court added that the failure to conduct a brief *voir dire* examination of the jurors on their return from home—even in a case in which the defendant consented to the separation of the jurors—raised "constitutional problems of deprivation of the right to an impartial jury." *Id.* at 203. Finally, the court expressed general concern about the trial court's allowing the jurors to deliberate late into the night, particularly without

**4.** This hearing was named after *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960).

having made tentative arrangements for motel accommodations. *Id.* at 203–04.

■ We share the concerns of the Court of Appeals about permitting a jury, particularly in a criminal case, to deliberate late into the night without a recess. III Standards for Criminal Justice, Standard 15–4.-4(b) (1980) provides, "The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." In this case the court did not require the jurors to deliberate late into the evening. When the court suggested that the jury retire for the night, the jury responded that they wished to continue. Moreover, it is apparent that the length of the deliberations on August 8 did not pressure the jury into an ill-considered verdict: the verdict was not reached until the following morning, after the overnight recess. As a general rule, however, the trial court should intervene at an appropriate time and order an overnight recess in the juror's deliberations.[5]

The only issue having any potential bearing on the validity of the verdict is the question of the propriety of the trial court's sending the jurors home for the night. If the defendant voluntarily consented to sending the jurors home, this case is controlled by our decision in *State v. Harris*, 333 N.W.2d 873 (Minn.1983), in which we held that by consenting to the overnight separation of the jurors during their deliberations the defendant forfeited his right to raise the issue on appeal. Certainly, the defendant did consent to sending the jurors to their homes. The decision whether or not to consent was undoubtedly a difficult decision made under the pressure of events outside the control of the court or parties, but that does not make it unique. Most decisions, whether about trial tactics or something else, are pressured by external forces. Here the trial court's statement that the clerk had not thus far had any success in finding a sufficient number of rooms in one hotel or motel to accommodate all 12 jurors cannot be said to have been unfair toward the defendant nor to have coerced his consent. Since, however, the Court of Appeals concluded that the defendant did not voluntarily consent and that, therefore, the trial court erred in sending the jurors home, we shall decide the case on the issue whether or not any error in sending the jurors home without the consent of the defendant requires a new trial.

The Court of Appeals took the position that permitting the jurors to separate during deliberation was "presumptively prejudicial and is reversible error." 355 N.W.2d at 203 (quoting *State v. Holly*, 350 N.W.2d 387, 389 (Minn.App.1984)). The term "presumptively prejudicial" seldom appears in criminal law. Ordinarily, a convicted criminal defendant who seeks a new trial because of alleged trial error bears the burden of convincing the appellate court not only that error occurred but that it was prejudicial. If the appellate court concludes that error occurred, it analyzes the error in the context of the record on appeal to determine the likelihood that the error affected the verdict. The latter determination is made without recourse to any presumption of prejudice although the more

---

**5.** Standards Relating to Juror Use and Management, Standard 18(d) (1983) provides that "A jury should not be required to deliberate after normal working hours unless the trial judge after consultation with counsel determines that evening or weekend deliberations would not impose an undue hardship upon the jurors and are required in the interests of justice." The comment to the standard provides:

In determining whether to require a jury to continue its deliberations into the evening or the weekend, the paramount concern should be whether the extension beyond normal working hours will enhance the rational deli-

berative process which the jury is charged to perform. Among the factors which the judge should weigh are the views and preferences of the jurors and of counsel, the length of time that the jury has been deliberating, the likelihood that the jurors would be exposed to improper information or influences, and the complexity of the case. In addition, the judge should ascertain whether the jurors appear to be fatigued and should inquire, particularly when Friday evening and weekend sessions are at issue, whether the deliberations would interfere with the religious beliefs or practices of any member of the jury.

serious the error, the more probable it is that the court will find prejudice. *See State v. Caron,* 300 Minn. 123, 218 N.W.2d 197 (1974).

There are, to be sure, certain errors which are deemed to be so serious that they automatically entitle the defendant to a new trial. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) and *United States v. Cronic,* 468 U.S. 648, 104 S.Ct. 2039, 2046–47, 80 L.Ed.2d 657 (1984), both indicating that the complete denial of counsel to a defendant in a criminal case is conclusively presumed to be prejudicial because prejudice is so likely that case by case inquiry into prejudice is not worth the cost to the judicial system. To the same effect, *see State v. Wiplinger,* 343 N.W.2d 858 (Minn. 1984), where we held that "if a defense counsel impliedly admits a defendant's guilt without the defendant's permission or acquiescence, the defendant should be given a new trial even if it can be said that the defendant would have been convicted in any event." *Id.* at 861.

A few trial defects, notably those affecting the defendant's right to a decision by an impartial jury based only on evidence adduced in court, have been characterized as being "presumptively prejudicial." For example, in *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), the United States Supreme Court made this statement:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

The Court added, however, that the presumption is rebuttable. *Id.* We followed *Remmer* in *State v. Cox,* 322 N.W.2d 555 (Minn.1982), a case in which the sheriff told some of the jurors before the state had rested that he felt the state had proven its case. Citing *Remmer,* we said that the statement by the sheriff raised a presumption of prejudice. 322 N.W.2d at 558. We concluded, however, that this presumption was rebutted by the record on appeal. *Id.* at 559. Several facts persuaded us that the jury's verdict was not tainted: among them were the fact that the sheriff's remark was expressed as an opinion affected by the sheriff's own prejudices, the fact that the evidence of the defendant's guilt was overwhelming, and the fact that the trial court promptly took steps to cure the error by examining the jurors and instructing them to decide the case solely on the testimony of the sworn witnesses. *Id.*

Not all states have statutes or rules prohibiting the separation of jurors during overnight recesses in their deliberations. Indeed, it appears that in a majority of jurisdictions the trial court, at least in noncapital felony cases, has discretion to permit the jurors to separate during overnight recesses in deliberations.[6] In those jurisdictions, the defendant seeking a reversal of his conviction on the basis of a separation of the jurors during their deliberations bears the burden of showing that he was prejudiced by the separation. Annot., 72 A.L.R.3d 248, 253–54 (1976). On the other hand, when separation occurs in violation

---

**6.** The federal courts apparently generally leave it to the trial court's discretion whether to let the deliberating jurors separate during overnight recesses, at least in ordinary criminal cases, although as a matter of practice most trial judges do not allow this. 2 C. Wright, *Federal Practice and Procedure: Criminal* 2d § 389, at 399 (1982); 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 5.20, at 153 (3d ed. 1977); *United States v. Williams,* 635 F.2d 744 (8th Cir.1980) (trial court has considerable discretion in ordinary criminal case to separate a jury during deliberations, so long as trial court admonishes jurors at time of separation as to duties and responsibilities when not in court). The relevant ABA Standards recommend leaving the issue of sequestration to the discretion of the trial court. *See, e.g.,* II Standards for Criminal Justice, Standard 8–3.6(b) (1980); III Standards for Criminal Justice, Standard 15–3.7(a) (1980); Standards Relating to Trial Courts § 2.64(d) (1976); and Standards Relating to Juror Use and Management, Standard 19 (1983).

of statute, rule or court order, a number of courts have held that a presumption of prejudice is raised, with the burden being upon the state to overcome this presumption. *Id.* at 273. Other courts decline to find such a presumption. *Id.* at 279.

It seems to us that there is a significant difference between the recognition that any private communication, contact, or tampering, directly or indirectly, with a juror during a criminal trial about the matter pending before the jury bespeaks such a probability of interference with the jury's function that it raises a rebuttable presumption of prejudice, *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 674 (1954), and the declaration that any separation of the jury after submission of the case without the consent of the parties raises a presumption of prejudice and requires a new trial. More than 70 years have elapsed since this court, noting that the purpose underlying the statute requiring jurors to be kept together during deliberations is to secure the rights of the litigants against the possibility of jury tampering, ruled that separation of the jury is presumptively prejudicial. *State v. Georgian*, 124 Minn. 515, 145 N.W. 385 (1914) (presumption rebutted, new trial denied). We now hold that mere separation of the jury in violation of Minn.R.Crim.P. 26.03, subd. 5, without more, does not raise a presumption of prejudice, and *Georgian* is hereby overruled. In such a case, how-

ever, prejudice will be presumed upon a showing of any private communication or contact or any other circumstance suggestive of improper influence or jury tampering, direct or indirect, and the state will bear the burden of overcoming the presumption.

Here there is no evidence nor is there even an allegation that during the period of separation any juror was contacted about the matter pending before them or otherwise exposed to any outside influence. Although the case involved a serious felony, the trial apparently failed to generate any contemporaneous coverage in the newspapers or on radio or television.[7] Notwithstanding the lack of publicity, the trial court cautioned the jurors before sending them home for the night during their deliberations, just as he had done before sending them home during each of the previous overnight or weekend recesses in the trial. Furthermore, the jurors were separated only from midnight until 8:30 a.m. and they had to travel distances of up to 60 miles each way; in short, as a practical matter, they had time only for driving home, sleeping, eating breakfast, and driving back to the courthouse. While it would have been appropriate—indeed, advisable—for the trial court to conduct a brief *voir dire* of the jurors before the jurors resumed their deliberations, defense counsel did not request such a *voir dire*[8], nor is there any reason to believe that such a *voir dire* would have

---

7. Indeed, before sending the jurors home for the weekend preceding the final submission of the case to them, the trial court discussed this with counsel, as follows:

   THE COURT: * * *. I think it's my duty to caution them about talking about this case.
   And have either of you noticed anything in the newspaper about this case?
   [THE PROSECUTOR]: Your Honor, there has been nothing in the newspapers that I've seen, there has been no calls to my office from newspapers asking about how the case is going, The Sheriff is here, there has been nothing coming through the Sheriff's office.
   THE COURT: Nothing on the radio, television?
   [THE PROSECUTOR]: Nothing on the radio, nothing on the television. I don't know that the world knows that Walker [the city of the trial] is alive and well.

   THE COURT: [Defense Counsel], are you aware of any media publicity about the case yet?
   [DEFENSE COUNSEL]: I haven't paid attention to any newspaper or radio, I haven't noticed, I haven't seen.
   THE COURT: I haven't either. I'm not aware of any. Bring the jury in.

8. Defense counsel waited until after the jurors returned their verdict, then requested a *Schwartz* hearing at which each juror would be individually questioned. The trial court did not abuse its discretion in refusing to conduct such a hearing, inasmuch as there was no reason to suspect that jurors had been exposed to any outside influence. *State v. Rachuy*, 349 N.W.2d 824 (Minn.1984).

done anything but establish that none of the jurors was contacted or otherwise exposed to any outside influence. We conclude that the facts simply do not justify an inference of prejudice.[9]

Accordingly, we reverse the decision of the Court of Appeals and reinstate the judgment of conviction.

Reversed; judgment of conviction reinstated.

WAHL, Justice (concurring specially).

I cannot agree with the majority opinion on the issue of jury sequestration but under the facts of this case I do not reach a different result.

The effect of the court's ruling in this case is to change the plain meaning of Minn.R.Crim.P. 26.03, subd. 5, greatly limiting the protection of the right to a fair trial this rule affords to criminal defendants. Rule 26.03 requires criminal juries to be sequestered while they deliberate unless the defendant consents to their separation.

In this state, it is a long-standing precedent that sequestration of jurors during deliberation is necessary to protect defendants against even the possibility of outside influence or jury tampering. Where the jury is allowed to separate, it was inferred defendant was harmed "unless it clearly and affirmatively appears that no prejudice has resulted." *State v. Georgian*, 124 Minn. 515, 145 N.W. 385 (1914). Today, the majority opinion overrules *Georgian* and shifts to the defendant the burden of showing that prejudice resulted from admittedly improper jury separation by holding "mere

separation of the jury in violation of Minn. R.Crim.P. 26.03, subd. 5, without more, does not raise a presumption of prejudice * * * * [P]rejudice will be presumed upon a showing of any private communication or contact or any other circumstance suggestive of improper influence or jury tampering, direct or indirect * * * * " (17).

This new rule might be all the protection of the right to a fair trial required by the federal constitution under *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). Minnesota, however, has chosen more affirmative protection of the right to fair trial as a matter of judicial policy in Minn.R.Crim.P. 26.03 and legislatively in Minn.Stat. § 631.09 which this rule amends. Section 631.09 mandates jury sequestration during deliberation without the possibility of waiver. These provisions are based on the reasonable assumption that jurors are especially open to prejudicial influence during deliberation. No further evidence, arguments or instructions will be presented to dissipate the prejudice of outside influence. The morally responsible juror may quite understandably be deeply concerned about the responsibility in fulfilling his or her role and anxious for guidance in reaching the right verdict. Often, the outside influence is not overt, such as a bribe, but subtle and may not even be within the awareness of the juror.

"[I]t is usually impossible to determine whether such influences actually prejudice a juror against the defendant in a particular case. The juror himself may well be unaware of the subtle influences

---

**9.** We note that even if separation raised a presumption of prejudice, the immediate remedy would not be to grant the defendant a new trial. Rather, the correct approach would be to first examine the record on appeal to determine if the record contained facts rebutting the presumption of prejudice. *State v. Cox*, 322 N.W.2d 555 (Minn.1982). If it did not, then the next step would be not to reverse and remand for a new trial but to simply remand for a post-conviction evidentiary hearing at which the jurors could be questioned to determine if in fact they were exposed to any improper outside influences. This was the approach taken in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct.

450, 98 L.Ed. 674 (1954), and was the approach endorsed more recently in *Smith v. Phillips*, 455 U.S. 209, 217–18, 102 S.Ct. 940, 946–47, 71 L.Ed.2d 78 (1982), and in *Rushen v. Spain*, 464 U.S. 114, 119–20, 104 S.Ct. 453, 456–57, 78 L.Ed.2d 267 (1983). If the trial court at such a hearing were to determine that outside influence had been brought to bear upon one or more of the jurors, then the correct approach for the trial court to take would be identical to that which we took in *State v. Cox*, 322 N.W.2d 555, 559 (Minn.1982), specifically, to estimate the probable effect of the influence on the jury verdict.

which affect his decision. For this reason, admonition and instruction of the jury is probably ineffective in ameliorating the prejudicial effects of separation during the deliberations."

*State v. Smalls,* 99 Wash.2d 755, 665 P.2d 384, 391 (1983) (reaffirming rule that jury separation over defendant's objection is presumptively prejudicial).

These considerations, in addition to federal and state constitutional concerns to ensure defendant a fair trial by an impartial jury and a defendant's right to confront all the witnesses and evidence used to convict him or her, recommend the Court of Appeals rule in this case. In its ruling in this case, and in an earlier decision, *State v. Holly,* 350 N.W.2d 387 (Minn.App.1984), the appeals court held that jury separation without defendant's consent was presumptively prejudicial. *Holly,* 350 N.W.2d at 389; *Sanders,* 355 N.W.2d at 204.[1] In *Holly,* the court suggested that this presumption could, nonetheless, be overcome if the trial court questioned the jury about any outside influence when they returned to deliberation after a separation. *Holly,* 350 N.W.2d at 389–90.[2] Even if such influence is found, the trial court should not automatically order a new trial, but should estimate the likely effect of the influence on an average juror to determine if it is so minimal as to overcome the presumption of prejudice. *Id.*

The practicality of this procedure was apparent to the majority; its opinion suggests a similar procedure, but only after defendant has carried the burden of showing outside influence, misconduct or tampering. 206–207 and fn. 9. *Holly* would automatically trigger such examination after any jury separation in violation

of Rule 26.03, subd. 5. The difference in the burden placed on the trial court by the *Holly* rule and the majority rule in this case is minimal; the difference in protection of defendant's right to a fair trial by an unbiased jury is significant.

It is my view that *Georgian* should not be overruled. I would hold that a jury separation in violation of Minn.R.Crim.P. 26.03 is presumptively prejudicial, and that the voir dire procedure suggested in *Holly* should be used by the trial court as a means of determining whether the presumption of prejudice has been overcome in any particular case. However, because this trial was conducted before the appeals court decided *Holly,* the trial court did not have the benefit of *Holly's* suggested procedure to rebut the presumption of prejudice raised when it permitted the jury to separate in violation of Rule 26.03. As the majority opinion sets out, the record reflects no circumstances suggesting improper influence on the jury. I, therefore, find the presumption of prejudice in this case rebutted.

---

**1.** The Court of Appeals of Wisconsin has recently held a presumption of prejudice arises when a trial court violates a statute which require jury sequestration after the jury has retired by allowing the jury to separate after its deliberations have started. *State v. Halmo,* 125 Wis.2d 369, 371 N.W.2d 424 (Wis.App.1985).

**2.** The South Dakota Supreme Court and the Washington Court of Appeals have also held that jury separation during deliberations in vio-

lation of rule or statute is a presumptively prejudicial error. These courts held, however, a voir dire of each juror by the trial court with participation of counsel on return to deliberation after separation may rebut the presumption of prejudice if no outside influence on the jurors is clearly shown in findings by the trial court. *State v. McComsey,* 323 N.W.2d 889 (S.D.1982); *State v. Bockman,* 37 Wash.App. 474, 682 P.2d 925 (Wash.App.1984).